**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Nana AGYEMANG, also known as
James Amabuto, also known as
Nanda Alapati, Defendant–Appellant.**

**No. 88–2577.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 13, 1989.

Decided May 16, 1989.

As Amended May 26, 1989.*

---

* This opinion was originally released on May 16, 1989 without the concurring opinion of Judge Cudahy. It is now re-released with that concurrence. There has been no change in the majority opinion.

Frank M. Tuerkheimer, LaFollette & Sinykin, Madison, Wis., for defendant-appellant.

Daniel P. Bach, Asst. U.S. Atty., Madison, Wis., for plaintiff-appellee.

Before CUMMINGS, CUDAHY and MANION, Circuit Judges.

MANION, Circuit Judge.

Nana Agyemang pleaded guilty to two counts of bank fraud, 18 U.S.C. § 1344. Agyemang appeals his sentence, protesting the procedure the district court used at the sentencing hearing, the court's reliance on hearsay information, and the adequacy of the information to support certain assertions in the presentence report that he challenged. Agyemang also contends that the district court should have sentenced him under the Sentencing Guidelines (which the district court previously had found unconstitutional) rather than under pre-Guideline law. We reject Agyemang's arguments concerning his sentencing hearing and the information upon which the district court based sentence but we vacate his sentence and remand for resentencing under the Guidelines.

## I.

In early June 1988, Nana Agyemang was facing trial on two indictments charging a total of seven counts. The first indictment alleged that in January 1987 Agyemang, using the alias James C. Amabuto, opened checking accounts at the Valley and M & I Banks of Madison, Wisconsin. "Amabuto" deposited checks into those accounts that were drawn on accounts that he knew contained insufficient funds to cover the checks. During January and February 1987, Amabuto allegedly withdrew $4,900 from the Valley Bank and $3,354.70 from the M & I Bank, causing overdrafts in those amounts in his accounts. (We shall refer to this indictment, and the conduct it alleges, as the "Amabuto indictment" or "Amabuto scheme").

The second indictment alleged that in late December 1987 Agyemang, using the alias Nanda Alapati, opened checking accounts at the Valley Bank of Shorewood Hills and the M & I Bank of Hilldale (both in Madison). As in the Amabuto scheme, "Alapati" deposited checks in those accounts drawn on accounts containing insufficient funds to cover the checks. During January 1988, "Alapati" withdrew $4,314.17 from the Valley Bank and $4,195.00 from the M & I Bank, causing overdrafts in those amounts in his accounts. (We shall refer to this indictment, and the conduct it alleged, as the "Alapati indictment" or the "Alapati scheme").

Agyemang's trial on the two indictments was set for June 13, 1988. After negotiations with the government, Agyemang pleaded guilty to a superseding information that charged two counts of bank fraud, 18 U.S.C. § 1344. These counts alleged modified versions of the bank fraud scheme alleged in the Alapati indictment. According to the information, Agyemang, as Alapati, cashed two checks totaling $2,340 at the Valley Bank of Shorewood Hills and withdrew a total of $2,595 from Alapati's savings account at the M & I Bank of Hilldale.

At the time Agyemang pleaded guilty, he was also facing trial in Wisconsin state court on state bad check charges that arose from a series of bad checks that Agyemang had allegedly drawn on the Alapati account and passed to merchants in Dane and Rock Counties in Wisconsin. The state agreed to dismiss those charges when Agyemang pleaded guilty to the federal charges. In exchange for the state's dropping the bad check charges, Agyemang agreed that an Assistant Dane County District Attorney (the "state prosecutor") could write a letter to the court setting out sentencing argu-

ments and recommendations and petitioning the court for restitution for the merchants. Agyemang's guilty plea also provided that he would pay $16,763.87 in restitution to the banks defrauded by the Alapati and Amabuto schemes (although he pleaded guilty to bank fraud counts alleging a total loss of around $5,000) and that the government would dismiss the Alapati and Amabuto indictments.

At Agyemang's guilty plea hearing on June 9, Judge Shabaz ordered that the presentence report be made available to Agyemang by July 15. Judge Shabaz ordered that Agyemang make any challenges to the report by July 25 and that the government respond by August 4, the date set for sentencing.

Agyemang's counsel wrote a letter to the court detailing his challenges to the presentence report. The letter made four specific challenges. Agyemang first challenged paragraph 17 of the report, which asserted that he withdrew an additional $1,650 in cash from the Valley Bank of Shorewood Hills on January 21, 1988 as part of the Alapati scheme. Second, Agyemang challenged paragraph 19, which asserted that he was involved in the Amabuto scheme. Third, Agyemang challenged paragraph 31, which recommended increasing the applicable offense level under the Guidelines by three because his crimes resulted in a loss of $10–20,000. Finally, Agyemang challenged paragraph 32, which recommended that the offense level be increased by two because his crimes involved "more than minimal planning." The letter also incorporated by reference an earlier letter counsel had written to the probation officer. That letter outlined the evidence that counsel would have presented at trial to rebut Agyemang's involvement in any broad bank fraud scheme, and also included a letter from a handwriting analyst that concluded that Agyemang had not written certain unspecified samples.

The government responded to Agyemang's challenges by writing a letter to Judge Shabaz and Agyemang's counsel. The letter outlined the government's position regarding Agyemang's challenges.

The letter also specifically stated that the government expected "to rebut [Agyemang's] challenges and arguments at the sentencing hearing," and urged Judge Shabaz to consider the disputed information in the presentence report in sentencing Agyemang.

At the sentencing hearing, Judge Shabaz offered Agyemang the chance to make additional challenges to the presentence report and asked Agyemang's counsel if he wished to present any evidence to support his challenges. Counsel stated that he did not intend to present anything beyond the materials he had already submitted. Judge Shabaz then asked the Assistant United States Attorney whether the government had any evidence to present; the AUSA replied that the government did. Agyemang's counsel objected to the government's evidence because he had not received any notice that the government was going to present evidence. Judge Shabaz overruled the objection.

The government's first witness was FBI agent Thomas Marquardt. Marquardt testified that in January 1987 he had spoken to a man who identified himself as Nana Agyemang. Marquardt identified Agyemang in court as the man he had spoken to. The government then called employees of three different merchants in Madison and Janesville, Wisconsin, who identified Agyemang as the man who had purchased merchandise from them with checks drawn on Alapati's account.

The government's final witness was Brian Kobinsky, the FBI agent who had investigated the Alapati and Amabuto schemes. Kobinsky's testimony essentially summarized the information he had gathered during his investigations. Agyemang objected to much of Kobinsky's testimony as hearsay; the district court overruled those objections.

During his investigation, Kobinsky had obtained bank photographs of transactions by both "Alapati" and "Amabuto." Those pictures were taken about one year apart. The pictures all show a black, bearded male (Agyemang is black and had a full beard) wearing what appears to be an identical

overcoat. The government introduced these pictures into evidence during Kobinsky's testimony.

Kobinsky testified that he had interviewed several tellers and bank officials at the victim banks who had handled transactions with "Amabuto" or "Alapati." One teller identified Agyemang's picture from a photo array as Amabuto. Another teller identified Agyemang's picture from a photo array as Alapati. An assistant vice-president at the M & I Bank of Hilldale gave Kobinsky a written history of the "Alapati" account, including documents showing a $1,650 cash withdrawal from that account on January 21, 1988.

Kobinsky testified about both schemes' details. Both "Amabuto" and "Alapati" had rented postal drop boxes at U.S.A. First Services in Madison. "Amabuto" and "Alapati" had both used U.S.A. First's address, along with their drop box numbers, as their home addresses in applying to open bank accounts. "Alapati" and "Amabuto" also both used false Social Security and telephone numbers on their account applications.

Kobinsky also related the details surrounding Agyemang's arrest. According to Kobinsky, a man who identified himself as Nanda Alapati asked Jeff Weyer, U.S.A. First's owner, to forward some packages to a postal box in Irving, Texas. Kobinsky sent the forwarding address, along with copies of "Alapati's" photo from the M & I Bank of Hilldale, to the FBI's Dallas office. FBI agents in Texas photographed a black man who picked up packages from the postal box in Irving. After comparing those pictures to the ones Kobinsky sent, the agents concluded that the pictures were of the same man. That man turned out to be Agyemang, whom the agents arrested on February 2, 1988, when he returned to the postal box to pick up a package. Among the items the agents found on Agyemang when they arrested him was a business card from the postal box rental service in Irving, a business card from U.S.A. First with box number 167 (the box "Alapati" had rented) written on it, and an index card bearing a Texas address that "Alapati" had used (along with U.S.A. First's address) in applying to open his accounts.

Agyemang's counsel vigorously cross-examined the government's witnesses. During his cross-examination counsel was able to turn up possible flaws and suggestiveness in the identification procedures the FBI used, and other weaknesses in the eyewitness identifications. Counsel was able to elicit from Kobinsky that some of the bank employees he had spoken to had failed to identify Agyemang at all. Counsel was also able to elicit from Kobinsky the fact that Agyemang's fingerprints turned up on none of the checks that the government had tested for prints.

Besides highlighting the weakness of the identifications and the lack of fingerprint evidence, Agyemang's planned trial defense had been to attempt to shift the blame for the broad Alapati and Amabuto schemes to Patrick Asubonteng, an acquaintance of Agyemang with facial features somewhat similar to Agyemang's. Counsel followed the same tack at sentencing. On cross-examination Kobinsky testified that he spoke to Asubonteng at the Madison airport the day after Agyemang's arrest. Asubonteng was taking a United Airlines flight out of Madison; the ticket was paid for by a check drawn on the Alapati account. Asubonteng was in a hurry to leave and gave Kobinsky a phony story about interviewing with a bank in Florida as an excuse to end the questioning. Asubonteng left Madison, never to (voluntarily) return. Kobinsky also testified on cross-examination that he had interviewed an employee at Woodman's, one of the stores "Alapati" had passed a bad check to. According to that employee, "Alapati" drove off in a 1978 Toyota with a license plate bearing the letter "C," two other letters, and the number "898." Asubonteng owned a 1978 Toyota with a similar license plate number.

After the government finished presenting its evidence, Judge Shabaz allowed Agyemang to testify, despite the fact that counsel had declined to present testimony earlier. Agyemang testified that he had

been in Madison twice, and that he was not in Madison in January 1987 when FBI agent Marquardt claimed to have spoken to him. In his testimony, Agyemang painted himself as Asubonteng's almost unwitting dupe. Agyemang said he had come to Madison in January 1988 to investigate the University of Wisconsin's MBA program and to find a place for his family and himself to stay if he enrolled in the program. According to Agyemang, on the day he arrived in Madison he ran into Asubonteng; while in Madison he ended up staying with Asubonteng. Twice during his stay, Agyemang cashed checks bearing "Alapati's" name for Asubonteng. Agyemang pleaded guilty based upon those transactions. For his trouble, Asubonteng gave Agyemang about $900 and bought him a pair of sneakers, a coat, and a plane ticket. Agyemang denied any further involvement in or profit from the Alapati scheme, and denied any involvement in the Amabuto scheme.

Agyemang's counsel wanted to present testimony from two other witnesses: the Woodman's employee, who would testify that Agyemang was not "Alapati," and that "Alapati" had driven off in the 1978 Toyota; and a handwriting analyst, who would testify that the handwriting on certain "Alapati" and "Amabuto" samples she examined was the same person's handwriting but that it was not Agyemang's. Judge Shabaz denied the continuance; he did, however, allow counsel to make an offer of proof. Judge Shabaz also allowed the government to make an offer of proof concerning testimony from its own handwriting expert. That expert would have testified that handwriting on certain "Alapati" and "Amabuto" samples he had examined was probably the same person's, and that Agyemang was possibly that person.

After hearing arguments by the government's and Agyemang's attorneys, Judge Shabaz made findings on Agyemang's challenges to the presentence report. First,

Judge Shabaz found that Agyemang passed the bad checks to the merchants in Dane and Rock Counties.[1] Second, Judge Shabaz found that Agyemang had withdrawn $1,650 from the M & I Bank of Hilldale on January 21, 1988. Third, Judge Shabaz found that Agyemang was involved in the Amabuto scheme. Fourth, Judge Shabaz found that the Amabuto and Alapati schemes caused a $16,700 loss to the victim banks so that it was appropriate to raise the applicable offense level under the Guidelines by three. Finally, Judge Shabaz found that Agyemang's offenses involved more than minimal planning, so that it was appropriate to raise the applicable offense level under the Guidelines by two.

Because he had previously found the Guidelines unconstitutional, Judge Shabaz sentenced Agyemang under pre-Guideline law. Under that law, Judge Shabaz sentenced Agyemang to a term of 42 months imprisonment on Count I and ordered Agyemang to pay $31,971.93 in restitution. On Count II, Judge Shabaz suspended sentence and placed Agyemang on five years probation to commence after the prison term for Count I ended. Judge Shabaz made the restitution he had ordered a condition of probation. Judge Shabaz also announced what Agyemang's sentence would have been under the Guidelines. Judge Shabaz stated that, if the Guidelines applied, he would have sentenced Agyemang to concurrent 14–month prison terms on both counts and a three-year supervised release term following the prison term. He also stated that he would have ordered Agyemang to pay $31,971.93 in restitution.

## II.

In light of the Supreme Court's decision in *Mistretta v. United States*, —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), upholding the Sentencing Guidelines' constitutionality, it was error for Judge Shabaz to sentence Agyemang under pre-Guideline law. Therefore, we must vacate

---

1. In his letter detailing Agyemang's challenges, counsel did not specifically challenge Agyemang's alleged role in the scheme to pass bad checks to the merchants. Judge Shabaz, however, concluded that Agyemang's submissions to the court sufficiently challenged his role in the scheme involving the merchants so as to require the court to make a finding on that issue.

Agyemang's sentence and remand for re-sentencing. But we still must consider Agyemang's challenges to the procedure used at his sentencing hearing and to the findings Judge Shabaz made on Agyemang's challenges to the presentence report.

■ Agyemang contends that allowing the government to present evidence at the sentencing hearing without notifying him beforehand denied him due process. Agyemang complains that because of the lack of notice he was not properly prepared to cross-examine the government's witnesses or to rebut their testimony by presenting his own evidence. Agyemang's notice argument founders at the start. Just as a defendant has no constitutional right to have the prosecution reveal its witnesses' names before trial, *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977), *United States v. Bouye*, 688 F.2d 471, 473–74 (7th Cir.1982) (per curiam), a defendant has no constitutional right to have the government reveal the testimony that it will present at a sentencing hearing. *United States v. Cusenza*, 749 F.2d 473, 478 (7th Cir.1984); see also *United States v. Jackson*, 649 F.2d 967, 978–79 (3d Cir.1981). If the government need not tell the defendant who it plans to call to testify or what evidence it plans to present, it follows that the government need not notify a defendant that it plans to present evidence at a sentencing hearing.

In any event, Fed.R.Crim.P. 32(c)(3) clearly contemplates that the court will hear testimony at sentencing. Rule 32(c)(3)(D) provides that when a defendant challenges information in a presentence report the district court can either disregard the challenged information at sentencing or make findings regarding the challenges. The court's discretion to make findings necessarily implies the possibility that the court will hear testimony. Since the government had informed Agyemang that it intended to rebut his challenges, Agyemang should have realized that the government might introduce evidence at the sentencing hearing.

Agyemang argues that even if he was not entitled to notice that the government was going to present testimony at the sentencing hearing, the district court erred by denying his motion for a continuance. We think not.

■ A convicted defendant has a right to be sentenced on the basis of accurate and reliable information. *United States ex rel. Welch v. Lane*, 738 F.2d 863, 864–65 (7th Cir.1984). One major purpose of a sentencing hearing is to allow the sentencing judge to determine what information is or is not reliable enough to consider in sentencing. A sentencing hearing satisfies due process if it is sufficient to allow the district court to "exercise its sentencing discretion in an enlightened manner." *United States v. Satterfield*, 743 F.2d 827, 840 (11th Cir.1984); cf. *United States v. Palma*, 760 F.2d 475, 477 (3d Cir.1985) (the same degree of due process protection required at trial is not required at a sentencing hearing).

■ In protecting a defendant's right not to be sentenced based on inaccurate or unreliable information, this court has focused upon the defendant's opportunity to rebut the government's evidence and the information in the presentence report. See, e.g., *Cusenza*, 749 F.2d at 478; *United States v. Harris*, 558 F.2d 366, 374 (7th Cir.1977); *United States ex rel. Welch v. Lane*, 738 F.2d at 868 n. 7. It is appropriate to apply this standard to determine whether denying a continuance at a sentencing proceeding makes the proceeding fundamentally unfair (and hence denies the defendant due process). Judge Shabaz's decision to deny Agyemang's request for a continuance easily passes this test; Agyemang had ample opportunity to rebut the government's evidence. Agyemang's counsel vigorously cross-examined the government's witnesses, and was able to highlight the weaknesses in their testimony (particularly the eyewitness testimony). Through the cross-examinations, his own testimony, and the offer of proof regarding the Woodman's employee and the handwriting analyst, Agyemang rebutted every key point the government made, and presented his

defense that Asubonteng was the real culprit.

Agyemang argues that with more time to prepare, he could have cross-examined the government's witnesses even more thoroughly, and he could have presented his other witnesses' live testimony. Agyemang also argues that he could have taken steps to insure that the in-court identifications were less suggestive. But while all these steps would have been desirable, due process guarantees a fair sentencing hearing, not a perfect one. The lack of notice and the court's refusal to deny the continuance did not make Agyemang's sentencing hearing unfair.

### III.

■ Agyemang also argues that Judge Shabaz erroneously found that he was involved in the Amabuto scheme, that, as "Alapati," he withdrew $1,650 from the M & I Bank of Hilldale on January, and that he was responsible for the loss to the Dane and Rock County merchants caused by bad checks passed by "Alapati." We review a district court's factual findings at a sentencing hearing for clear error. 18 U.S.C. § 3742(d); *United States v. Mejia–Orosco,* 867 F.2d 216, 221 (5th Cir.1989).

### A.

The most significant evidence supporting the finding that Agyemang was involved in the Amabuto scheme was FBI agent Kobinsky's testimony that a teller at the Valley Bank of Madison had identified Agyemang's picture from a photo array as Amabuto. Agyemang contends that it was improper for Judge Shabaz to rely on this hearsay. It is not, however, necessarily improper for a sentencing judge to consider hearsay. Federal Rule of Evidence 1101(a) provides that those rules—including the hearsay rules—do not apply at sentencing proceedings. 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information ... which a court ... may receive and consider for the purpose of imposing an appropriate sentence." Consequently, a sentencing judge has "great latitude in the information he uses to determine the sentence" and may consider a wide variety of information that would be inadmissible at trial, including hearsay. See *United States v. Nowicki,* 870 F.2d 405, 406–07 (7th Cir.1989) (citations omitted); see also *United States v. Marshall,* 719 F.2d 887, 891–92 (7th Cir.1982); *Cusenza,* 749 F.2d at 478. It is appropriate to rely on hearsay at sentencing because the sentencing process requires "the fullest information possible concerning the defendant's life and characteristics." *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949). See also Fed.R.Crim.P. 32(c)(2), which details the types of information a probation officer should include in a presentence report. The Sentencing Reform Act and the Sentencing Guidelines do not change this. Although the Act and the Guidelines were intended to guide and limit the district courts' sentencing discretion, they were not intended " 'to eliminate the thoughtful imposition of individualized sentences.' " *Mejia–Orosco,* 867 F.2d at 219 (quoting S.Rep. No. 225, reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3235). Thus, "[t]he sentencing judge has an obligation to consider all the relevant factors in a case," *id.;* to do so, the judge may rely on a broad range of information. See 18 U.S.C. § 3661. There is also a practical reason for allowing hearsay: given the breadth of information properly allowable at a sentencing hearing, not allowing the court to consider hearsay could turn the sentencing hearing "into an endless parade of witnesses...." *United States v. Harris,* 558 F.2d at 377 (dissenting opinion); see also *Williams,* 337 U.S. at 250, 69 S.Ct. at 1084. To require the government to present live witnesses or other admissible evidence to support every assertion in a pretrial report, just as it must support every element of a crime at trial, would turn the sentencing hearing into a trial, something a sentencing hearing was not meant to be. See *Satterfield,* 743 F.2d at 840.

■ Some tension does exist between the more lax evidentiary standards at sentencing—including allowing hearsay—and a defendant's right not to be sentenced

based on inaccurate information. See *United States ex rel. Welch v. Lane,* 738 F.2d at 868 n. 7; *Harris,* 558 F.2d at 373–74. This court has resolved that tension by insisting that a defendant have a reasonable opportunity to rebut contested hearsay and that the contested hearsay be reliable. See *Harris,* 558 F.2d at 374, 376; see also *Nowicki, supra,* 870 F.2d at 407; *United States ex rel. Welch v. Lane,* 738 F.2d at 868. But by insisting that a defendant have a "reasonable opportunity to rebut" contested hearsay, we do not mean that a judge must hold an elaborate trial-type proceeding before considering hearsay in sentencing; instead, the judge must simply give the defendant an opportunity to show why the hearsay information is wrong and to present his side of the story. See *Cusenza,* 749 F.2d at 478. And by insisting that the contested hearsay be reliable, we do not mean that the hearsay must fit into some recognized hearsay exception or that the government prove the hearsay is true beyond a reasonable doubt; rather, the sentencing judge must be satisfied, in light of all the circumstances, that the hearsay is worthy of credence. Cf. *Harris,* 558 F.2d at 376 (court must consider whether some hearsay is "so unreliable it could not be considered in imposing sentence"). Since the sentencing judge is in the best position to make these determinations, we will reverse his decision to consider contested hearsay only if he abuses his discretion. See *United States v. Marshall,* 719 F.2d at 892 (to find that hearsay is reliable is within the district court's discretion).

◼ Agyemang had a sufficient opportunity to rebut Kobinsky's testimony about the teller's identification. As we have noted, Agyemang's counsel vigorously cross-examined Kobinsky and was able to point out the weaknesses in the teller's identification. Also, by Kobinsky's cross-examination, by his own testimony, and by the handwriting evidence he proffered, Agyemang was able to rebut the government's general contention that he was Amabuto and was able to present his theory that Asubonteng was the real culprit.

Kobinsky's testimony about the identification also was reliable enough for Judge Shabaz to consider. Kobinsky's testimony involved only one level of hearsay, and the hearsay declarant was a named witness, not an unidentified informant. The fact that Kobinsky was an FBI agent indicated that he was accurately relating the information he had. See *Marshall,* 719 F.2d at 892. Moreover, other evidence linked Agyemang to the Amabuto scheme and corroborated Kobinsky's testimony. FBI agent Marquardt testified that Agyemang was in Madison in January 1987, the time of the Amabuto scheme. Agyemang argues that this proves only that he was in Madison at that time, not that he was part of any fraudulent scheme. But Agyemang testified that he was not even in Madison in January 1987. Judge Shabaz did not believe that testimony. Given Agyemang's denial that he was in Madison at the time of the Amabuto scheme, testimony that he was in Madison at that time raises an inference that he was involved in the Amabuto scheme; why else would he lie about being in Madison?

The government also introduced bank photographs of a bearded black man making a transaction with the teller at the Valley Bank on January 31, 1987. Judge Shabaz was unable to make any identification from one of the pictures; however, he did find that the other picture "apparently identifies Mr. Agyemang." Focusing on the word "apparently," Agyemang contends that Judge Shabaz's finding is equivocal, and therefore does not support the ultimate finding that Agyemang was Amabuto. But Agyemang overemphasizes the word "apparently." Judge Shabaz's finding indicates to us that he believed that the man the Valley Bank photograph depicted was Agyemang. Judge Shabaz, who had the opportunity to personally observe Agyemang and compare that observation with the bank photographs, was entitled to make that finding.

◼ Besides, the government introduced pictures of a bearded black man making a transaction at the Valley Bank of Shorewood Hills on January 20, 1988.

Judge Shabaz unequivocally found that the man in those pictures was Agyemang; indeed, Agyemang pleaded guilty to making a transaction as Alapati on that date. The man in both the 1987 and 1988 photographs was wearing what appeared to be the same overcoat, which, given the similarity in appearance between the man in the pictures, supports the conclusion that the pictures show the same man. That the man in the pictures was wearing the same overcoat *could* be a coincidence; Judge Shabaz, however, was certainly entitled to believe it was not. All told, the photographic evidence, along with Marquardt's testimony placing Agyemang in Madison at the general time of the Amabuto scheme (testimony made more important by Agyemang's denying that fact) sufficiently corroborated Kobinsky's hearsay identification testimony so that Judge Shabaz could rely on it. Taken together, all this evidence provided a sufficient basis for Judge Shabaz to find that Agyemang participated in the Amabuto scheme, and Judge Shabaz did not clearly err in so finding.

### B.

The government's primary proof that Agyemang withdrew $1,650 from the "Alapati" account at the M & I Bank of Hilldale on January 21, 1988, was Kobinsky's testimony that a bank vice-president had given him documents showing that the withdrawal occurred. Agyemang does not challenge that the withdrawal occurred. He does correctly note, however, that Kobinsky's testimony does not identify him as the man who withdrew the money.

While Kobinsky's testimony did not directly link Agyemang to the $1,650 withdrawal, the government produced other circumstantial evidence that linked Agyemang to the Alapati scheme beyond the limited extent he admitted. The most important of this evidence was the evidence of "Alapati's" use of drop box services at U.S.A. First Services in Madison. FBI agents in Texas arrested Agyemang after observing him pick up packages at a postal drop box to which "Alapati" had told U.S.A. First's owner to forward packages.[2] Among the items that the agents found on Agyemang when they arrested him were a business card from U.S.A. First and an index card bearing an address that "Alapati" had used in applying to open his accounts in Madison. The circumstances surrounding Agyemang's arrest, and the items found on him when arrested, raise the inference that he had more than a limited involvement in the Alapati scheme. Agyemang claims that he gave an innocent explanation for having the U.S.A. First business card, but Judge Shabaz did not have to believe it.

Kobinsky also testified that Jeff Weyer, U.S.A. First's owner, stated that he knew Asubonteng by face and that Asubonteng was not Alapati. This severely undercut Agyemang's defense that Asubonteng was the real culprit. It also undercut Agyemang's contention that he was an unwitting dupe whom Asubonteng lured into committing a crime and, in turn, cast serious doubt upon the truthfulness of all his testimony.

Besides the testimony concerning Agyemang's arrest and the testimony undercutting Agyemang's main defense, the government offered evidence that Agyemang conducted transactions as "Alapati" at the M & I Bank of Hilldale on January 20, 1987 (the bank pictures and Agyemang's own admissions), and evidence that Agyemang also conducted transactions as "Alapati" at the Valley Bank of Shorewood Hills on January 20. And, as we shall see, there is other evidence that links Agyemang to a broader scheme than he cared to admit to (that is, evidence that he passed "Alapati" checks to merchants). Taken together, all this evidence was sufficient to allow Judge Shabaz to conclude that Agyemang was the Alapati scheme's principal architect. From that, it was not clearly erroneous to conclude that Agyemang was responsible for

---

**2.** Although the evidence concerning Agyemang's arrest and his use of U.S.A. First Services was hearsay related by Agent Kobinsky, Agyemang does not challenge it on appeal. Even if he did, we would find that Judge Shabaz could properly consider it.

the $1,650 withdrawal from the M & I Bank of Hilldale.

## C.

Regarding Agyemang's responsibility for losses to merchants, the government introduced testimony from three employees of three different merchants in Madison and Janesville, Wisconsin, who identified Agyemang as having purchased merchandise from them with checks drawn on Alapati's account. The court also had before it the state prosecutor's letter that set out the numbers, dates, and amounts of checks "Alapati" passed to merchants as part of his scheme.

Agyemang contends that the eyewitness testimony did not establish that he passed any bad checks to merchants because the witnesses did not testify that the checks had bounced. But the eyewitness testimony was sufficient to establish that Agyemang had indeed passed "Alapati" checks to local merchants, a fact Agyemang consistently denied. And Agyemang's assertion that the testimony did not show that any checks bounced is not entirely accurate. Two of the eyewitnesses did not testify that the checks they received bounced. However, Joanne Splinter, who worked at Saxer's Sporting Goods in Janesville, testified that she first spoke to FBI agents when she "tried to follow up on the check when it came back." This testimony indicates that the check that Agyemang passed to Splinter did bounce.

The government introduced the state prosecutor's letter to show that "Alapati" had passed *bad* checks to merchants. Agyemang contends that Judge Shabaz should not have considered this letter because it was hearsay. To properly analyze Agyemang's contention, it is important to note that the thrust of his defense was that he did not participate in the Alapati scheme beyond the extent to which he pleaded guilty. In other words, Agyemang's de-

fense to the assertion that he caused losses to merchants by passing bad "Alapati" checks to them was that he never passed any Alapati checks to any merchants. Agyemang never questioned the amount that the merchants lost, the victims' identities, or the fact that the checks were drawn on "Alapati's" account.

In the context of Agyemang's challenges, Judge Shabaz did not abuse his discretion by relying on the state prosecutor's letter. Agyemang had ample opportunity to rebut the letter regarding the one fact that he specifically challenged—his identity as "Alapati." The eyewitness testimony, coupled with all the other evidence of Agyemang's role in the broader Alapati scheme, sufficiently indicated that Agyemang was the culprit so that Judge Shabaz could reasonably rely on the information in the letter.[3] Moreover, in pleading guilty Agyemang specifically agreed that the assistant state prosecutor could present information to the court regarding the merchants' losses. Having made this agreement, Agyemang could not reasonably expect that Judge Shabaz would not consider that information, at least given the other information that pointed to Agyemang's broader involvement in the Alapati scheme. The assistant state prosecutor's letter, along with that other evidence, was sufficient to allow Judge Shabaz to find Agyemang responsible for the merchants' losses.

## IV.

Agyemang's sentencing hearing did not deny him due process, and Judge Shabaz's Rule 32 findings were not clearly erroneous. However, we must vacate Agyemang's sentence and remand this case for resentencing because it was error for Judge Shabaz to sentence Agyemang under pre-Guideline law. As we have noted, Judge Shabaz did state on the record what Agyemang's sentence would have been under the Guidelines; resentencing might

**3.** Agyemang points to disparities between the witnesses' testimony and the letter involving exact dollar amounts of bad checks and the exact location of merchants. Judge Shabaz heard all the evidence and arguments and apparently

concluded that the disparities were not sufficient to prevent finding that Agyemang was responsible for the losses listed in the letter. We cannot say that Judge Shabaz clearly erred in so concluding.

thus involve nothing more than an order substituting that Guideline sentence for the sentence previously imposed. Nevertheless, we leave the ultimate application of the Guidelines to Agyemang's sentence to Judge Shabaz.

For the reasons stated in this opinion, we vacate Agyemang's sentence and remand this case to the district court. Circuit Rule 36 shall not apply.

VACATED AND REMANDED.

CUDAHY, Circuit Judge, concurring.

I join fully in Judge Manion's clear and persuasive opinion for the panel. I am constrained to note, however, how this case illustrates the heightened importance of the fact-finding process at sentencing under the Guidelines. Now, each fact found at the time of sentencing has a specific and inescapable consequence for the defendant's sentence. In this case, although Agyemang pleaded guilty only to two counts, his sentence will presumably issue as the automatic consequence of facts found later on. Of course, the same facts could have been found under pre-Guidelines law, but then the trial judge's discretion decisively broke the iron link between facts and sentence. As the facts become dispositive, the importance of accurate fact-finding must inevitably increase. It has always been the law that a defendant has a right to be sentenced on the basis of correct information, but now the significance of that information is palpable, immediate and inescapable. It seems to me to follow that in the Guidelines era even greater care will have to be exercised, and closer scrutiny accorded to, the process by which the sentence-dictating facts are established.