In the
United States Court of Appeals
For the Seventh Circuit

Nos.  98-3449, 98-3639, 98-3640,
98-3841, 00-1047/*

United States of America,

Plaintiff-Appellee,

v.

Desmond Cavender, a/k/a Grip, Demetrius
Campbell, a/k/a Ill, Solomon Montague,
a/k/a "C," a/k/a C-Man, a/k/a Chinaman, and
Milton Buchanan, a/k/a Romie, a/k/a Romeo,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 97 CR 50026--Philip G. Reinhard, Judge.

Argued November 1, 1999--Decided October 3, 2000

   Before Easterbrook, Ripple, and Diane P. Wood, Circuit
Judges.

    Diane P. Wood, Circuit Judge.  This case arose
from a major cocaine bust in Rockford, Illinois.
Appellants Milton Buchanan, Solomon Montague,
Desmond Cavender, and Demetrius Campbell were,
along with several others, indicted in December
of 1997 for their role in the conspiracy.
Cavender and Buchanan pleaded guilty to
particular charges, while Montague and Campbell
went to trial and were convicted by the jury. All
four have appealed, raising a variety of points
related to their convictions and sentences. One
serious evidentiary error has persuaded us that
we must reverse Campbell's conviction; we find
the remainder of the arguments raised either
without merit, harmless, or waived, and we
therefore affirm the judgments entered against
Buchanan, Montague, and Cavender.

I
   The defendants were involved in a sophisticated
business arrangement for the sale of crack
cocaine (more formally known to the law as
cocaine base) in the Rockford area. Along with
Bennie Griffith, who later turned state's
evidence, they were the key players. According to

the grand jury's indictment, the conspiracy began as early as June 1994 and continued through July 1997, and it involved the distribution of multiple kilograms of cocaine base. Some participants purchased large quantities of the drug, some cut and bagged it for distribution, and others sold it from designated "spots" run by the conspirators.

At Campbell and Montague's trial, the government presented Griffith as its star witness. Griffith explained that he began selling drugs with Cavender and Buchanan in late 1994, and that Montague joined the group in 1996. Griffith testified that they all, at various points in time, purchased large amounts of cocaine, and hired workers to bag and sell it. He said that he sold crack to Campbell beginning in 1996, and that Campbell had told him that he was reselling the drugs on the west side. Griffith identified, through photos, several spots that the conspiracy controlled and used as sales locations, including various residences and the area around the Jane Addams housing project. The government also introduced 118 tapes of conversations into evidence. The recorded conversations were all in code and street slang, but Griffith deciphered them for the jury (which otherwise would have had little to no idea of what the people were talking about).

Two other cooperating government witnesses who were former members of the conspiracy also testified at trial. The first, James Perkins, said that he engaged in several drug transactions with Montague and Buchanan. Noah Miller, the other, said that he worked mainly with Montague dealing drugs, but he knew that others were working with Montague. Miller offered his own explanations of the recorded conversations for 11 of the 118 tapes. His definitions were in many instances different from those Griffith had used--a discrepancy Griffith explained by saying that the code he used in conversing with the conspirators was his special language, not general street slang. Miller identified his own voice in all 11 tapes, and identified Montague's voice in some of them.

The remaining testimony came from various FBI and police officers, who reported that they had seen Montague, Buchanan, Cavender, and sometimes Campbell in vehicles together at different times driving to and from what Griffith had described as the conspiracy's drug spots. Three Rockford police officers also testified that they found some bags of crack in Montague's pants one evening near the Jane Addams housing project.

The jury convicted Campbell on Count 1 (conspiracy to possess with intent to distribute

and to distribute cocaine base, in violation of 21 U.S.C. sec. 846), and Montague on Counts 1 and 16 (possession of cocaine base with intent to distribute, in violation of 21 U.S.C. sec. 841(a)(1)). Campbell received a life sentence, to be followed by 10 years of supervised release, and Montague received a life sentence along with a concurrent 30 years of imprisonment on Count 16, also to be followed by 10 years of supervised release. Cavender, who pleaded guilty to Count 1, was sentenced to 312 months' imprisonment followed by eight years of supervised release. Buchanan's guilty plea covered both Count 1 (conspiracy), Counts 8, 9, 11, and 15 (distribution of cocaine base), and Count 17 (possession with intent to distribute cocaine base). His sentence was for 420 months' imprisonment followed by eight years of supervised release.

II

  A.   Impeachment of Griffith:   Evidentiary rulings

  Griffith, as we have already noted, was the linchpin of the government's case at the trial. Naturally, this meant that Campbell and Montague had a strong interest in undermining him in front of the jury, and the government had an equally strong interest in demonstrating his credibility. Toward the latter end, on direct examination Griffith was asked about his drug use before he left Chicago for Rockford and joined the conspiracy. He insisted that he had neither used nor sold any drugs during that time period:

Q:  [Government's attorney]:   And when you were in Chicago did you sell drugs?

A:   No.

Q:   Never?

A:   No.

Q:   Did you use drugs?

A:   No.

On cross examination, he stuck to that story and added that he had not dealt in drugs while he was living in Chicago, in the following exchange:

Q:  [Montague's attorney]:   Bennie, you testified earlier you lived in Chicago, right?

A:   That is correct.

Q:   But in Chicago you didn't deal any drugs,

right?

A:   That is correct.

At least with respect to Griffith's testimony on direct examination about use (rather than dealing), it is almost certain that he was lying. In fact, Griffith had been convicted of a felony in Chicago in 1994 for possession of a controlled substance. After the exchange we have just noted, Montague's attorney attempted to impeach Griffith by introducing evidence of that 1994 Chicago drug possession conviction. The district court sustained the government's objection to the evidence, and it was excluded from the trial. Both Montague and Campbell objected.

   On appeal, Campbell and Montague argue that this ruling was in error. Montague argued that it violated his Sixth Amendment confrontation rights, and both claim that it misapplied Federal Rules of Evidence 609(a) and 403. Normally, we review a restriction on cross-examination only for abuse of discretion. See United States v. Graffia, 120 F.3d 706, 712 (7th Cir. 1997). The exception arises when the restriction implicates the criminal defendant's Sixth Amendment right to confront witnesses against her, in which case the standard of review is de novo. See United States v. Sasson, 62 F.3d 874, 882 (7th Cir. 1995).

   Under the Sixth Amendment, a criminal defendant has the right to confront the witnesses against her. U.S. Const. amend. VI. The exposure of a witness's motivations to lie is a proper and important function of the constitutionally protected right of cross-examination. See Sasson, 62 F.3d at 882. The right to cross-examine adverse witnesses, however, is not absolute. See id. The Confrontation Clause guarantees only an opportunity to conduct a thorough and effective cross-examination during which the defense has a chance to discredit the witness, "not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam). The district court retains wide latitude to impose reasonable limits on the scope and extent of cross-examination based on concerns about things like harassment, prejudice, confusion of the issues, or interrogation that is repetitive or only marginally relevant. See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

   In this case, the district court's decision not to allow the defense to impeach Griffith did not rise to the level of a Sixth Amendment violation. The defense was allowed to put into evidence the fact that Griffith had a conviction of some crime

on his record, and it was allowed to explain that Griffith was profiting as a result of his testimony by getting a lower sentence under his plea agreement. Because the defense was able to question Griffith about some of his potential biases, and thus to introduce the idea that Griffith might not be a reliable witness, this situation differs from that in Van Arsdall, where the defense was completely foreclosed from presenting any evidence of a witness's bias. See id.

This does not mean, however, that the exclusion of the felony drug possession conviction was inconsequential. To the contrary, Rule 609(a)(1) of the Federal Rules of Evidence states that "evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403," if it was punishable by imprisonment in excess of one year. (Emphasis added.) Rule 403 codifies the court's power to exclude otherwise relevant evidence whose probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Thus, unless Rule 403 justified its exclusion, the evidence of Griffith's former conviction should have been admitted.

The government argues that there was such a reason, because the evidence would have been cumulative and a waste of time. We are hard pressed to see what it was with which this evidence cumulated. The only impeachment evidence admitted at trial was some testimony indicating that Griffith lied to an officer when he was first arrested, and evidence that Griffith was being compensated for testifying. The jury heard absolutely nothing that would have hinted to them that Griffith was lying to them right there as he sat in the witness stand. The evidence of his prior conviction would have strongly suggested at a minimum that he had lied during his direct examination, when he denied that he had used drugs in Chicago. Splitting hairs, the government argues that the evidence of his conviction for possession would not truly have operated to impeach him, because there is a difference between possession and use. There may indeed be a semantic difference between these two, but when the shoe is on the other foot the government frequently argues that a jury can infer use from possession: people normally do not run the risk of purchasing user quantities of controlled substances just to put them on the shelf. Further, Griffith also disavowed selling drugs. In the real world, it is hard to imagine what Griffith would have done with the drugs if he did not either use or sell them. Had the evidence of

the conviction come in, the jury would have been entitled to come to the reasonable conclusion that Griffith had just lied to them. And if he was willing to tell them a bald-faced lie on that point, it might also have wondered what the rest of his testimony was worth. Even though the standard of review for this kind of evidentiary ruling is abuse of discretion, we conclude in this case that it was error to exclude the evidence of Griffith's narcotics conviction.

B.  Harmless Error

This leads us to the government's alternative argument, which predictably enough is that, even if the decision to exclude the conviction evidence was error, it was harmless. A harmless error, as Federal Rule of Criminal Procedure 52(a) tells us, is one that "does not affect substantial rights," and it must be disregarded. See United States v. Norwood, 798 F.2d 1094, 1098 (7th Cir. 1986). An error in the refusal to admit evidence is harmless if the evidence of guilt was overwhelming and the defendant was allowed to put on a defense, even if that defense was not as complete as the defendant might have preferred. See United States v. King, 75 F.3d 1217, 1222 (7th Cir. 1996); United States v. Hanson, 994 F.2d 403, 407 (7th Cir. 1993). The problem with the government's harmless error argument in this case is that Griffith was the prosecution's key witness. He was the only witness to connect all of the defendants to each other. He was the only witness to explain the meaning of all but 11 of the 118 tapes admitted at trial. He set up the time frame for the conspiracy, and he connected the various drug "spots" to members of the conspiracy. Evidence indicating that Griffith was lying on the stand might well have caused the jury to discount his testimony. We must therefore examine carefully the remaining evidence in order to determine whether the error was harmless. Upon doing so, we are convinced that the case against Montague was so strong that the error was indeed harmless, but that without Griffith the case against Campbell falls apart.

Montague was convicted on two counts of the indictment: Count 16, which charged him with possession of three grams of crack that three police officers found on him one night at the Jane Addams housing project, and Count 1, the conspiracy charge. The conviction on Count 16 was supported by testimony from all three of the police officers who caught him red-handed. That was ample standing alone, and thus any error committed with respect to Griffith was harmless for that conviction. Similarly, we find that Montague's conviction on Count 1 was supported by

overwhelming evidence, even disregarding Griffith. A conspiracy conviction requires a showing that a conspiracy existed (two or more persons joined together for the purpose of committing a criminal act) and that the charged party knew of and intended to join the agreement. See United States v. Gutierrez, 978 F.2d 1463, 1469 (7th Cir. 1992). The worst one can say is that without Griffith, the precise time frame for the conspiracy was less clear and the importance of certain locations might not have been established. But the key points were supported through the testimony of James Perkins and Noah Miller. Both of them testified that Montague worked with Buchanan to run a drug conspiracy. Perkins and Miller admitted to being members of that conspiracy. They both claimed to have helped exchange large amounts of money with large amounts of crack, for and with Montague and Buchanan. Miller explained 11 tapes linking himself to Montague and drug sales. Perkins and Miller's testimony easily showed that a conspiracy existed, and that Montague knew about it and was an important part of it.

Perkins and Miller had nothing to say about Campbell, however. Perkins listed the individuals whom he believed were the members of the conspiracy he had joined, and his list did not include Campbell. In fact, Perkins testified that he had no dealings with Campbell. Miller said that he had met with Campbell, but only on less than five occasions. He speculated that Campbell worked for Montague, but he was unable to come up with any acts, statements, or reasoning to support that belief. None of the tapes that Miller translated for the court contained Campbell's voice. Once Griffith's testimony is excluded, the only evidence implicating Campbell in the conspiracy is police testimony that Campbell rode in a car with Montague a few times, and Campbell's admission that he is a crack addict and sometimes bought drugs from Montague. This is too slender a reed to show that Campbell knew about any conspiracy between Montague and Buchanan and anyone else, or that he intentionally aided that conspiracy.

Perhaps, one might say, the independent evidence against Montague would have bolstered Griffith's general credibility, and thus counteracted the impeaching effect of the evidence of Griffith's lying that the jury should have heard. Maybe then the jury might have decided to rely on Griffith's testimony connecting Campbell to the conspiracy notwithstanding his demonstrated mendacity. But such unfounded speculation is not enough to show that Campbell's substantial rights were not affected by the exclusion of the evidence; he is not required to prove his innocence beyond a

reasonable doubt to prevail on this point. The jury should have heard the excluded testimony about Griffith; the error in excluding it was harmful to Campbell and requires the reversal of his conviction. Compare Lindh v. Murphy, 124 F.3d 899, 902 (7th Cir. 1997) (finding a trial court's decision to restrict impeachment evidence of a key witness to violate the defendant's Confrontation Clause rights).

III

We need not tarry on the remaining claims the various defendants raise. To make the opinion easier to follow, we organize our consideration of them defendant-by-defendant.

A. Campbell

Campbell argues that there was insufficient evidence from which a jury could find that he was a member of the conspiracy. We examine his insufficiency claim, even though we have already decided his conviction must be reversed, because if inclusion of Griffith's testimony could not cure an insufficiency of evidence underlying Campbell's conviction, then he would be entitled to acquittal and the government could not retry him for the same crime.

We may overturn a verdict due to insufficient evidence only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. See United States v. Moore, 115 F.3d 1348, 1363 (7th Cir. 1997). With Griffith's testimony in the mix, as it would be on a retrial (albeit with the impeaching evidence as well), the evidence to convict Campbell was sufficient. Griffith claimed that he sold crack to Campbell from 1996 on, and that Campbell was reselling it on the West Side. Griffith interpreted some of the tapes to include Campbell discussing drug sales with other members of the conspiracy. A jury would be entitled, though not compelled, to believe this account. If it did, a conviction could stand. Campbell is therefore not entitled to avoid a possible retrial.

B. Montague

In his initial appeal (No. 98-3640), Montague argues that his sentence should not have been increased under U.S.S.G. sec. 2D1.1(b)(1) for possession of a firearm or under U.S.S.G. sec. 3A1.3 for physical restraint of a victim. We review factual determinations made at sentencing for clear error. See United States v. Wade, 114 F.3d 103, 105 (7th Cir. 1997). A defendant's

sentence may be enhanced under sec. 2D1.1(b)(1) if the defendant possessed a firearm during the commission of her offense, or if a co-conspirator possessed the firearm while acting in furtherance of the conspiracy and the co-conspirator's possession was reasonably foreseeable to the defendant. See United States v. Vold, 66 F.3d 915, 920 (7th Cir. 1995); U.S.S.G. sec. 1B1.3(a)(1)(B). In one of the audio tapes introduced into evidence, Griffith identified himself and Montague as the speakers. He explained that he said he had a .380, and Montague responded "I know, I got something too." Montague also referred to a "zero." Griffith said that these statements referred to guns possessed by both himself and Montague. The district court (which, of course, was fully aware of the potentially impeaching evidence which it did not allow into the trial and was not constrained by the formal rules of evidence at the sentencing phase), acted within its discretion in finding Griffith credible and in inferring from these tapes that either Montague had possessed a firearm in order to further the drug sale conspiracy, or that Griffith possessed it and his possession was reasonably foreseeable (in fact actually known) to Montague.

We also find no error in the district court's two level enhancement of Montague's sentence for physical restraint of a victim during an offense under sec. 3A1.3. Montague's presentence report stated that in March of 1996, Cavender and Buchanan tried to restrain a drug supplier whom they were trying to rob, and that they bound the supplier's girlfriend with duct tape. The district court relied on the presentence report in determining that sec. 3A1.3 should apply. Montague argues that this reliance was error, but he is wrong. A sentencing judge may consider a wide variety of information that would be inadmissible at trial. See United States v. Agyemang, 876 F.2d 1264, 1271 (7th Cir. 1989). District judges routinely rely on the information contained in presentence reports, which they are entitled to do as long as the report relied on bears the requisite indicia of reliability. See United States v. Hall, 212 F.3d 1016, 1023 (7th Cir. 2000). Montague points to nothing that would indicate that the information in this report failed that test.

Montague next argues that he was not involved in the incident of physical restraint. However, just as in the gun possession enhancement, if the act of restraint was committed by a co-conspirator in furtherance of the conspiracy, and if the act was reasonably foreseeable to Montague, then it may be considered relevant conduct for purposes of Montague's sentencing.

See U.S.S.G. sec.sec. 1B1.3(a)(1)(A) & (B). The district court did not clearly err when it decided that Cavender and Buchanan's restraint of the drug supplier's girlfriend was both reasonably foreseeable to Montague and undertaken in furtherance of the conspiracy's goal of possessing and distributing drugs.

Last, Montague complains in appeal No. 00-1047 that the district court erred in refusing to grant a motion for new trial under Rule 33 of the Federal Rules of Criminal Procedure that he filed on December 17, 1999, approximately 18 months after the jury returned its verdict on June 19, 1998. His motion argued that he was entitled to a new trial because the district court constructively amended the indictment under which he was being tried when it permitted the excision of a reference to the Vice Lords gang just before the case was sent to the jury. There are many reasons why this argument is unavailing. The easiest one is the one on which the district court relied: Rule 33 contains time limits for filing motions for new trial, and Montague missed his. A motion for new trial based on newly discovered evidence may be filed within three years of the verdict, but an allegation of a constructive amendment to the indictment that occurred during the trial is hardly "newly discovered evidence." Otherwise, the Rule states that the motion "may be made only within 7 days after the verdict . . . ." Many times seven days had passed before Montague presented this point to the district court, and the court had no choice but to refuse to consider it.

C.  Cavender

Cavender presents two arguments on appeal: 1) that the district court erred in denying his motion to vacate his guilty plea, and 2) that the court erred when it added three points to his criminal history based on a past firearms conviction. Cavender moved to withdraw his guilty plea because the preliminary sentence calculations described in his plea agreement were lower than the actual sentence he received. The discrepancy arose because the government was unaware of his prior juvenile convictions when the plea agreement was drafted. Cavender says that the attorney representing him in the juvenile proceedings told him that those convictions could not be used against him in the future. Cavender therefore decided not to tell either the government or his current attorney about the convictions, and they were not factored into the sentence proposed in his plea agreement.

While Federal Rule of Criminal Procedure 32(d) permits withdrawal of a plea upon a showing by the defendant of any fair and just reason, a defendant has no absolute right to withdraw a guilty plea. See United States v. McFarland, 839 F.2d 1239, 1241 (7th Cir. 1988). The decision to permit a plea withdrawal rests within the discretion of the district court, and we will reverse that decision only if the court abused that discretion. See United States v. Knorr, 942 F.2d 1217, 1219 (7th Cir. 1991). There was no abuse of discretion here. Usually, where the sentencing calculations in a plea agreement are described as "preliminary," the later imposition of a higher sentence does not violate the plea agreement. See id. at 1220. Nor does it provide the defendant with a "fair and just" reason to withdraw his guilty plea. See id. Cavender's plea agreement specifically said that the guideline calculations were "preliminary in nature," and explained that the probation office would conduct its own investigation in order to come to a final calculation. The government did not deliberately mislead Cavender. (If anyone was engaged in misleading behavior, it was Cavender, who would have been well advised to be more forthcoming with his own lawyer at the very least.) The court was well within its discretion to deny his motion to withdraw his guilty plea.

Cavender's second claim is that the district court should not have added three points to his criminal history for his prior firearms conviction under U.S.S.G. sec. 4A1.1. He argues that the prior conviction was equivalent to possessing a firearm in furtherance of the conspiracy, which was already factored into his sentence in a two level upward departure under U.S.S.G. sec. 2D1.1(b)(1). We need not delve into the merits of this argument, because Cavender has waived the right to make it. A defendant may waive her right to appeal as part of a written plea agreement, see United States v. Woolley, 123 F.3d 627, 631 (7th Cir. 1997), and Cavender did. His plea agreement stated that the "defendant knowingly waives the right to appeal any sentence imposed within the maximum provided . . . or the manner in which that sentence was determined." The court questioned Cavender to ensure that he understood the unambiguous waiver and its effect of precluding him from appealing the sentencing decision for any reason. Cavender swore in open court that he did understand it, and that is the end of the matter.

D. Buchanan

Buchanan's challenges to the constitutionality of his sentence and indictment are easily

dismissed as well. His argument that the Sentencing Guidelines are unconstitutional is foreclosed by Mistretta v. United States, 488 U.S. 361, 371 (1989). His argument that his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment because his sentence was longer than that of his co-defendants also fails. First of all, while the severe disproportionality in sentencing may lead to an Eighth Amendment violation, see Solem v. Helm, 463 U.S. 277, 290 (1983), there is no constitutional guarantee of proportionality in non-capital cases. See Harmelin v. Michigan, 501 U.S. 957, 965 (1991). Second, whether Buchanan's sentence is "disproportionate" to those of his co-defendants is not a pertinent question to ask, because we have a system of individualized sentencing which takes into account factors other than the type of crime, such as the criminal history of the particular defendant and the specific circumstances of the crime. See, e.g., Solem, 463 U.S. at 291. The difference between Buchanan's and his co-conspirators' sentences stems from the differences in their criminal histories and personal backgrounds, not from an Eighth Amendment violation. Compare United States v. McMutuary, 217 F.3d 477 (7th Cir. 2000) (rejecting justified disparities among co-defendants as a normal ground for departures); United States v. Hamzat, Nos. 97-1987 et al., 217 F.3d 494 (7th Cir. 2000) (same). Buchanan next raises the often-rejected argument (which we reject again here) that the higher sentencing range for cocaine base versus cocaine powder violates the Fifth Amendment's guarantee of equal protection. See, e.g., United States v. Booker, 73 F.3d 706, 710 (7th Cir. 1996).

Finally, Buchanan claims that he was denied due process because his indictment under 21 U.S.C. sec.sec. 846 and 841 did not list the specific quantity of cocaine base which he was ultimately convicted of possessing. Elements of an offense, unlike mere sentencing factors, must be charged in the indictment, submitted to a jury, and proven by the government. See Apprendi v. New Jersey, 120 S. Ct. 2348 (2000); Castillo v. United States, 120 S. Ct. 2090 (2000); Jones v. United States, 526 U.S. 227, 232 (1999). In an opinion handed down before Apprendi and Castillo were decided, we concluded that the quantity of a drug is a sentencing factor which need not be included in an indictment charging a sec. 841 violation. See United States v. Jackson, 207 F.3d 910, 920 (7th Cir. 2000).

We have no occasion here to consider whether Jackson should be reconsidered in light of the more recent decisions from the Supreme Court. We note, however, that different subsections of 21

U.S.C. sec. 841(b) carry different maximum prison terms, which was the point that the Court emphasized in Apprendi, where it held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 120 S. Ct. at 2362-63. So, for example, sec. 841(b)(1)(A) specifies quantities of various drugs that lead to sentences of 10 years to life (unless death or serious bodily injury result, in which case the minimum is 20 years); sec. 841(b)(1)(B), which deals with lesser quantities, calls for a sentence of 5 to 40 years (again with an exception for death or serious bodily injury); sec. 841(b)(1)(C) has a normal maximum of 20 years, and sec. 841(b)(1)(D) has a normal maximum of five years. In this case, however, the indictment charged that the defendants had handled "multiple kilograms of mixtures containing cocaine base," and this was the evidence put before the jury. That is all Apprendi would have required, and so even assuming that Apprendi requires us to reconsider Jackson, any error in this case was harmless. We stress that we are making no ruling today that Jackson is wrong; we reserve that question for a future case in which it will make a difference.

IV

We Reverse the judgment against Demetrius Campbell, and we Affirm the convictions and sentences of Desmond Cavender, Solomon Montague, and Milton Buchanan.

/* Appeal No. 00-1047 was filed after oral argument in the first four consolidated cases. We have concluded that it should be treated as a successive appeal under Internal Operating Procedure 6(b), and this panel has accordingly added it to the other cases. After reviewing the briefs in No. 00-1047, we have concluded that additional oral argument is unnecessary. The case is therefore submitted on the briefs. See Fed. R. App. P. 34(a).