**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Juventino MEJIA–OROSCO, Defendant–Appellant.**

No. 88–5584.

United States Court of Appeals, Fifth Circuit.

Feb. 17, 1989.

Rehearing Denied March 31, 1989.*

Alfredo Villarreal, Asst. Federal Public Defender, Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Everberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

* Opinion on Rehearing published at 868 F.2d 807.

Before CLARK, Chief Judge, HIGGINBOTHAM, Circuit Judge, and LITTLE,* District Judge.

CLARK, Chief Judge:

Juventino Mejia–Orosco was convicted of illegally transporting aliens into the United States in violation of 8 U.S.C. § 1324(a)(1)(B). He does not contest the underlying conviction, but argues that the district court imposed an improper sentence. Because the district court correctly applied the guidelines to its factual findings, and because those findings were not clearly erroneous, we affirm.

## I

Mejia–Orosco is a citizen of Guatemala. He earns his living trucking curios from Guatemala, through Mexico, to the United States. In April of 1988, on one of his many trips to this country, he brought along Hector Galvencio Paz–Ortega and Carlos Enrique Cruz–Morales, both citizens of Guatemala and purportedly related to Mejia–Orosco. After Mejia–Orosco and his two passengers had travelled through Mexico and arrived in Nuevo Laredo, Tamaulipas, Mexico, Paz–Ortega and Cruz–Morales disembarked.

Mejia–Orosco drove his van across the bridge into Laredo, Texas. Paz–Ortega and Cruz–Morales waded the Rio Grande. They did not pass through customs and had no legal right to enter this country. Mejia–Orosco and the aliens then regrouped and spent two days in Laredo. During this time, the group contacted relatives of the aliens living in the United States. The family members were instructed to wire Mejia–Orosco funds. He received $1,000 from Paz–Ortega's family in Los Angeles and $1,700 from relatives of Cruz–Morales living in New York City. Two days after arriving, the three drove to the Laredo International Airport. Mejia–Orosco supplied the aliens with airline tickets to San Antonio and the key to a motel room there. Later, Mejia–Orosco met the aliens at the motel and drove them to the San Antonio International Airport. At the airport, Paz–Ortega was detained and questioned by immigration officials. He admitted that he

and Cruz–Morales had illegally entered the United States with the aid of Mejia–Orosco. With this information, law enforcement officials were able to locate and detain Cruz–Morales, who was aboard an airplane awaiting departure to New York, and Mejia–Orosco. A search of Mejia–Orosco's van uncovered 4,102 United States dollars and 574,000 Mexican pesos.

Mejia–Orosco pled guilty to one count of illegally transporting aliens into the United States. He admits that he received $850 from each of the transported aliens in exchange for his illegal services. He was sentenced to 10 months in prison and fined $4,000. His van, used to transport the aliens from Guatemala, has been seized pending forfeiture proceedings.

The district court calculated the sentence imposed on Mejia–Orosco according to the guidelines promulgated by the United States Sentencing Commission. *See* 18 U.S.C. § 3553(a). On appeal, Mejia–Orosco argues that the district court erroneously imposed a sentence of 10 months imprisonment. The guidelines, in the defendant's view, would permit a maximum sentence of no more than 7 months. His appeal is specifically authorized by statute. 18 U.S. C. § 3742(a)(2).

## II

Our review of the sentence imposed by the district court is governed by 18 U.S.C. § 3742(d) and (e):

(d) Consideration.—Upon review of the record, the court of appeals shall determine whether the sentence—

(1) was imposed in violation of law;

(2) was imposed as a result of an incorrect application of the sentencing guidelines;

(3) is outside the range of the applicable sentencing guideline, and is unreasonable, having regard for—

(A) the factors to be considered in imposing a sentence, as set forth in chapter 227 of this title; and

---

* District Judge of the Western District of Louisiana, sitting by designation.

(B) the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c); or

(4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable.

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous.

(e) Decision and disposition

If the court of appeals determines that the sentence—

(1) was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate;

(2) is outside the range of the applicable sentencing guideline and is unreasonable or was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable, it shall state specific reasons for the conclusions and ...

it shall set aside the sentence and remand the case for further sentencing proceedings with such instructions as the court considers appropriate.

(3) is not described in paragraph (1) or (2), it shall affirm the sentence.

Under these provisions, the characterization of the alleged sentencing error is critical. A sentence imposed "outside the range of the applicable sentencing guideline" will be reversed only if it is unreasonable. 18 U.S.C. § 3742(e)(2). On the other hand, a sentence "imposed as a result of an incorrect application of the sentencing guidelines" must be reversed even if reasonable. 18 U.S.C. § 3742(e)(1). Findings of fact that underlie the district court's sentence are reviewed under a clearly erroneous standard. 18 U.S.C. § 3742(d).

The sentencing guidelines do not merely change the procedures used to impose sentences, they initiate an historic shift in modern penology. The guidelines are designed to create uniform, determinate sentences based upon the crime committed, not the offender. Congress abandoned the rehabilitation model that shaped penology in the Twentieth Century. Under the rehabilitation model, sentences were individualized. Prisoners were sentenced according to predictions of "their potential for, or actual rehabilitation." *United States v. Grayson*, 438 U.S. 41, 46, 98 S.Ct. 2610, 2613, 57 L.Ed.2d 582 (1978). From this premise, the maxim developed that "the punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949). Congress concluded after decades of empirical evidence that this commendable and ambitious approach had proven unworkable and unjust. Predictions of an offender's propensity for, or actual, rehabilitation were found to be unsubstantiated and, in fact, incapable of any scientific determination. The result was that an unjustifiably wide range of punishment was meted out to similar offenders convicted of committing similar crimes under like circumstances. In most cases, the district court would impose a term of imprisonment that was almost never fully implemented. Instead, prisoners were released based upon the determination of parole officials that the prisoner was rehabilitated.

By enacting the sentencing guidelines Congress returned federal sentencing to an earlier philosophy that the punishment should fit the crime and that the main purpose of imprisonment is punishment. Senator Edward M. Kennedy described the guidelines as "a comprehensive and far reaching new approach ... [designed to] reduce the unacceptable disparity of punishment that plagues the federal system, and ... to assure sentences that are fair—and are perceived to be fair—to offenders, victims, and society." 32 Fed.B. News & J. 60, 65 (1985). Similar crimes should be punished similarly. To accomplish this goal, Congress limited the discretion of district judges through the guidelines and

made the sentence imposed determinate by abolishing parole. The guidelines provide the analytic framework needed to create uniform sentences. The accompanying abolishment of parole ensures that the imposed sentence will be served.

Sentencing under the guidelines is not, however, an exact science. Justice cannot be meted out according to mathematical formulas. The universe of potential factors that might affect the seriousness of a given offense is too broad to be refined to a mechanistic approach. The sentencing guidelines are not intended to cover all contingencies or rigidly bind district judges. The guidelines do not impose the sentence, they provide a framework for a district court to impose a sentence. "The sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the guidelines in an appropriate case. The purpose of the sentencing guidelines is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences." S.Rep. No. 225, *reprinted in* 1984 U.S. Code Cong. & Admin.News 3182, 3235.

The district court's fact-finding power is an important guarantor of the practical judgment essential to any just sentencing procedure. As we have already mentioned, the guidelines statute expressly insulates such fact-finding against appellate attack. 18 U.S.C. § 3742(d) (endorsing the "clearly erroneous" standard). Once the district court has made factual findings, the court's sentence will be affirmed if it results from a proper application of the sentencing guidelines to those facts. On the other hand, if the court applies the guidelines to the found facts and then departs from the resulting sentencing range, the court must offer acceptable reasons for its departure: a departure is subject to reversal unless it is "reasonable." 18 U.S.C. § 3742(e).

## III

Sentencing under the Commission's guidelines is based upon two factors—the offense and the defendant's criminal histo-ry. The statute under which the defendant was convicted determines a base offense level. This base level is then adjusted upward or lower by specified offense characteristics. For example, robbery has a base offense level of 18. This base level is increased incrementally if the amount taken in the robbery totals more than $2,500. The level is also increased if a firearm is used, more if the firearm is brandished, even more if discharged. Any bodily injury resulting from the crime also increases the offense level. Cooperation with government officials, on the other hand, decreases the offense level. The defendant's criminal history category is calculated independently from the offense level and its incremental adjustments. One of six different categories is assigned the defendant based upon a point scale. Points are assigned to prior convictions depending upon the length of sentence and whether the instant offense was committed within two years of release from prison or while under any criminal sentence.

The final sentencing range is calculated from a table by cross-referencing the offense level with the defendant's criminal history category. The table sets sentencing ranges in which the maximum sentence exceeds the minimum by the greater of 6 months or 25%. This allows the district court some latitude to fine tune the sentence to the individual defendant and the circumstances of the defendant's offense. The district court may depart from the guideline-specified sentence when it finds "an aggravating or mitigating circumstance ... that was not adequately taken into consideration by the Sentencing Commission...." 18 U.S.C. § 3553(b). This discretion is narrowed by lists of those circumstances taken into consideration and those that do not justify a departure. *See* Guidelines at 5.25–5.34.

The district court calculates the offense level and the criminal history category from the information contained in the presentence report. Departures from the guidelines will also generally be justified from the information contained in this report. The accuracy of the presentence re-

port, therefore, is critical to proper application of the sentencing guidelines, and strict compliance with the rules of criminal procedure governing this report is warranted. 18 U.S.C. § 3552. Fed.R.Crim.P. 32(c).

In today's case, Mejia–Orosco does not challenge the information contained in the report. Rather, he contends that the evidence recited by the report does not justify the sentence imposed. Mejia–Orosco pled guilty to one count of illegally transporting an alien in violation of 8 U.S.C. § 1324(a)(1)(B). The base offense level for such a violation is 9. Guideline 2L1.1(a). Mejia–Orosco received a two-level reduction in this offense level for accepting responsibility for his offense. Guideline 3E1.1(a). He had a criminal history category of I, the lowest category. With these factors, the sentencing table sets a range of 1–7 months imprisonment. The imposed sentence of 10 months is thus, in the defendant's view, three months too long.

The district court, however, found that an offense level of 7 did not accurately reflect the nature of the crime committed. The court gave alternative justifications for raising the offense level to 9, which authorizes the stiffer 10–month sentence. First, the district court determined that Mejia–Orosco played an aggravating role in the offense; that is, he was an organizer, leader, or supervisor. Such a role in any criminal activity involving 2–5 participants warrants a 2–level increase in the offense level. Guideline 3B1.1.

The district court also justified the 2–level increase by reference to section 2L1.1(b)(2) of the guidelines, which requires a 2–level increase in the offense level if "the defendant previously has been convicted of smuggling, transporting, or harboring an unlawful alien, or related offense...." The district court classed a previous conviction for unlawful entry as a "related offense" because Mejia–Orosco was originally charged with transporting four illegal aliens, although he eventually pled guilty to a reduced charge of illegal entry. It is unclear whether the district court intended to apply 2L1.1(b)(2) directly, or to use it as the basis for a departure from the guide-lines. See §§ 4A1.3, 5K2.0. Mejia–Orosco argues on appeal that the district court misapplied the guidelines when it made these determinations and that this misapplication requires reversal of his sentence. Because we affirm based upon the court's first justification for the two-level increase, we do not reach the second.

■ An offender plays an aggravating role in the offense if the defendant "was an organizer, leader, manager or supervisor." Guideline 3B1.1. If the defendant was an organizer or leader of a criminal activity involving five or more participants, the offense level is increased by four levels. If there are less than five participants, the offense level increases two levels. The introductory statement to this part of the guidelines clearly indicates that there must be more than one participant involved in the criminal activity for this section to apply. However, the guideline makes clear, through its explanation of the term "otherwise extensive," that managerial status may attach by the orchestration of unwitting or duped participants, as well as through the leadership of criminally responsible participants. Although the government does not contend that Mejia–Orosco controlled a sufficient number of people to make his organization "otherwise extensive" within the meaning of § 3B1.1(a) or (b), he might have exercised enough control over unwitting participants to make him a manager within the meaning of § 3B1.1(c). Finally, "for the purposes of § 3B1.1, the aliens smuggled, transported, or harbored are not considered participants unless they actively assisted in the smuggling, transporting, or harboring of others." Commentary to Guideline 2L1.1.

The district court found that Mejia–Orosco was "an organizer, leader, manager, or supervisor." To decide Mejia–Orosco's appeal of this finding, we must first determine whether the finding was factual or legal. We hold that it was factual. The determination of manager status demands that the trial judge draw an inference from a variety of data, including the information in the pre-sentence report and the defendant's statements and demeanor at the sen-

tencing hearing. Of course, the fact of manager status may be more difficult to ascertain than purely physical facts—such as whether the defendant carried a gun during commission of the crime—and may depend upon an assessment of the broad context of the crime. But a complex fact is no less a fact.

The Supreme Court has recognized that findings which require both assessment of complex evidence as well as sensitivity to legal purposes may nevertheless be factual. The Court has held that whether cause exists to dismiss a venireman is a factual question. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 855, 83 L.Ed.2d 841 (1985). "Cause" is obviously a complex thing to perceive, but, for purposes of appellate review, it is factual nonetheless. On the civil side, the Court has held that the existence of discrimination is a question of fact. *Pullman–Standard v. Swint*, 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Indeed, in criminal cases under the Continuing Criminal Enterprise statute, 21 U.S.C. § 848, the defendant's status as a "manager"—precisely the issue raised by Mejia–Orosco—is a question of fact for the jury. *See e.g., United States v. Oberski*, 734 F.2d 1030, 1032 (5th Cir.1984) (terms "managed," "supervised," and "organized" are to be interpreted according to their ordinary, lay meaning).

Section 3B1.1 is not the only guideline provision calling upon district judges to make sophisticated factual determinations. Sections 3B1.2 (requiring the judge to decide whether the defendant was a "minimal participant" or "minor participant") and 3B1.3 (requiring the judge to decide, among other things, whether the defendant used a "special skill") demand comparable findings. Judicial fact-finding upon these matters will, like determinations of manager status, enjoy the protection of the "clearly erroneous" standard.

A more exacting approach to appellate review of sentences would frustrate the purpose of the guidelines. As we have already noted, the sentencing commission sought to ensure that district courts would continue to take into account "all the rele-vant factors in a case." Indeed, a cramped construction of the district court's fact-finding power would have a perverse consequence: the standard of review for departures from the guidelines would be more deferential than the standard of review for applications of the guidelines. This disparity would arise because 18 U.S.C. § 3742(e)(2) permits appellate modification to a sentence outside the range of the guidelines only if the sentence is not "reasonable." If factual findings were narrowly construed, and legal issues commensurately expanded, actual applications of the guidelines would be subject to review for legal error. District courts would have an incentive to insure against appellate reversal by footing their sentencing decisions on reasonable departures. Such a result would clearly undermine the purpose of the sentencing guidelines.

The standard of review which we establish today avoids this odd result. We will affirm sentences imposed by district judges who make factual findings that are not clearly erroneous, and who apply the guidelines to those findings. In such cases, the sentencing judge need not offer further reasons justifying the sentence. When, however, the judge departs from the guideline range, an additional reasonableness requirement applies: the judge must offer reasons explaining why the departure is justified in terms of the policies underlying the sentencing guidelines. *See* 18 U.S. C. § 3553.

Implicit in what we have said is the conclusion that the district court's simple statement that the defendant is a "manager" or "leader" is a finding of fact. Building on the lesson of *Wainwright v. Witt*, 105 S.Ct. at 855, we "decline to require the judge to write out" more specific findings about the defendant. We recognize that so formal a requirement would interfere with the smooth operation of the sentencing hearing. In some instances, what is necessarily a "judgment call" may not be susceptible of particularization. Nonetheless, we urge district courts to clarify their ultimate factual findings by more specific findings when possible. Specific findings will both

**222**

guide reviewing courts to the evidentiary basis for sentencing judgments, and also help the trial judge to identify matters relevant to application of the guidelines.

Application of the "clearly erroneous" standard to Mejia–Orosco's case is easy. The district judge concluded that the defendant was a manager, supervisor, organizer, or leader of a criminal activity. The undisputed evidence that relatives of the aliens were involved in the crime provides sufficient support for this factual finding. The relatives either knew that they were aiding a criminal enterprise, in which case they were criminally responsible participants, or they were duped into aiding the enterprise, in which case they were unwitting participants. In either case, the enterprise was extensive within the meaning of § 3B1.1. We therefore see no reason to disturb the factual findings of the district judge.

The judgment and sentence of the district court is

AFFIRMED.