UNITED STATES of America, Appellee,

v.

**Michael Vincent LANESE, et al., Defendants,**

**Michael Vincent Lanese, a/k/a "Vinnie" and Thomas Romano, a/k/a "T.R.," Defendants–Appellants.**

**Nos. 1374, 1379, Dockets 89–1079, 89–1133.**

United States Court of Appeals, Second Circuit.

Argued July 17, 1989.

Decided Nov. 29, 1989.

Paul B. Bergman, New York City, for defendant-appellant, Michael Lanese.

James J. Ruane, Bridgeport, Conn., Meehan & Meehan, for defendant-appellant, Thomas Romano.

J. Douglas Wilson, Dept. of Justice, Washington, D.C. Stanley A. Twardy, Jr., U.S. Atty., D.Conn., John H. Durham, Boston Strike Force, New Haven, Conn., for appellee.

Before WINTER and MAHONEY, Circuit Judges, and RE, Judge.*

RE, Chief Judge:

Defendants-appellants, Michael Vincent Lanese and Thomas Romano, appeal from judgments of conviction following a jury trial in the United States District Court for the District of Connecticut. Lanese and Romano were convicted of conspiring to "use ... extortionate means ... to collect any extension of credit," and "us[ing] ... extortionate means to collect any extension of credit," both in violation of 18 U.S.C. § 894(a)(1) (1982). Lanese was sentenced to 78 months' imprisonment to be followed by three years' supervised release, and fined $25,000. Romano was sentenced to 72 months' imprisonment, to be followed by three years' supervised release.

Lanese contends that the district court erred in refusing to admit evidence of an alleged extortionate activity by the government's principal witness, Eugene Golino, and thereby deprived Lanese of his constitutional right of confrontation and a fair trial. Lanese also contends that the district court erred in failing to sever his trial from the other co-defendants, in admitting evidence of previous alleged criminal activity of codefendant Iannucci, and in failing to instruct the jury as to multiple conspiracies. Finally, Lanese contends that the district court impermissibly sentenced him as "a manager or supervisor [of a] criminal activity involv[ing] five or more participants or ... otherwise extensive," pursuant to section 3B1.1(b) of the Sentencing Guidelines.

With the exception of the sentence imposed, we find the contentions of Lanese without merit, and the judgment of conviction is affirmed. Since the district court did not make a specific finding of the identities of the "five or more participants," or that the criminal activity was "otherwise extensive," this court cannot determine whether Lanese's sentence was correctly increased pursuant to section 3B1.1(b). Accordingly, as to Lanese, we remand, for the specific findings required by section 3B1.1(b) of the Sentencing Guidelines.

Romano, in agreement with Lanese, contends that the district court erred in not admitting evidence of the alleged extortionate activity of Golino. Romano further asserts that the district court erred in not admitting a police report as to the destruction of his car. He also contends that the district court erred in having sentenced him as a "manager or supervisor [of a] criminal activity involv[ing] five or more participants or ... otherwise extensive."

With the exception of the sentence imposed, the contentions of Romano are without merit, and the judgment of conviction is affirmed. Since the district court erred in sentencing Romano as a "manager or supervisor [of a] criminal activity involv[ing] five or more participants or ... otherwise extensive," we reverse and remand for a resentencing of Romano.

## BACKGROUND

In the fall of 1986, Eugene Golino began placing bets on sporting events with an

---

* The Hon. Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

illegal gambling business run by codefendant Joseph Iannucci, in Bridgeport, Connecticut. Golino incurred a gambling debt of $12,000 to Iannucci. Golino testified that, when he approached Iannucci and told him that he could not pay the debt immediately, Iannucci responded that "[s]omebody would come and see me." Subsequently, Golino was approached by Arnold Plotkin who, according to Golino, "showed me a baseball bat and a gun," and demanded payment of the debt.

After repaying the $12,000 debt owed to Iannucci, Golino continued gambling. He incurred an additional debt of $29,650 to Iannucci in February 1987, and told Iannucci that he could not pay the debt immediately. After being told by Iannucci that he "would get a visitor," Golino was again approached by Plotkin. Golino made monthly payments of $1,600 to Plotkin to pay off the debt owed to Iannucci. In addition, Plotkin advanced Golino $5,000 towards the debt, and demanded weekly payments of $250, as "juice." The $250 payments did not reduce the debts owed to either Plotkin or Iannucci.

In September 1987, Plotkin introduced Golino to Thomas Romano. Plotkin instructed Golino to make his $1,600 monthly payments to Romano. However, Plotkin continued claiming the $250 weekly payments from Golino. After Plotkin was shot to death, Romano demanded the $250 weekly "juice" payments from Golino.

Golino then began placing bets with a bookmaker referred to him by Romano. After he satisfied his debt to Iannucci, Golino also placed bets with Iannucci's service. By late November 1987, Golino had incurred losses of approximately $55,000 to Romano's bookmakers and $25,650 to Iannucci's bookmakers.

On December 18, 1987, Golino met with Romano at a Bridgeport diner, and paid $5,000 towards his gambling debts. Romano then telephoned Michael Lanese, who joined Romano and Golino at the diner. Lanese, who according to Golino "had a gun on his hip in a brown leather case[,]" asked Golino "[w]here's my money?" Lanese had Golino sign a promissory note, payable to "my friend Michael Lanese" for $80,000, which represented the approximate amount of money owed to both Romano and Iannucci.

In January 1988, Golino approached Federal Bureau of Investigation agents and agreed to cooperate in an investigation of illegal sports betting operations in Bridgeport. Several times during January 1988, Golino, either using a tapped telephone or wearing a concealed tape recorder, discussed his gambling debts with Romano. The tapes revealed that Romano urged Golino to pay his debts, and frequently warned Golino that if he did not pay he would be harmed or killed. On January 29, 1988, Golino and Romano met at a Bridgeport restaurant, and were joined by Lanese and two others. After Romano became suspicious of a vehicle, which was an FBI surveillance van parked near the restaurant, the meeting was moved to a nearby park.

According to Golino, at the park, Lanese "grabbed me by the throat, and he started shoving me up against the fence." Golino testified that Lanese told him "'[y]ou'd better have my money if you know what's good for you.... If you don't want to be lying next to Arnie Plotkin or visiting him, you'll have my money.'" Subsequently, Golino entered the federal witness protection program.

On June 23, 1988, Lanese, Romano, and Iannucci were indicted in the United States District Court for the District of Connecticut. They were charged with using "extortionate means ... to collect and attempt to collect extensions of credit, namely illegal gambling debts," in violation of section 894(a)(1) of title 18 of the United States Code, and for conspiracy to commit the same crime. Plotkin was named as an unindicted co-conspirator. Following a jury trial, although all three defendants were convicted, only Lanese and Romano have appealed.

## DISCUSSION

Both Lanese and Romano contend that the district court erred in not permitting them to cross-examine Golino, the prosecu-

tion's key witness, about the circumstances surrounding Golino's 1982 arrest for extortion.

In 1981, Golino, acting on behalf of his father-in-law, made several loans to Anthony Kicska, a distant relative by marriage of Golino. When Kicska defaulted on the loan, Golino accompanied his father-in-law to Kicska's place of business. According to Lanese, as Golino "was having a good time laughing about it[,]" Golino's father-in-law threatened to shoot Kicska if he did not repay the loans. Both Golino and his father-in-law were arrested in 1982. The charges were dropped after both Golino and his father-in-law agreed to pay Kicska $5000 each in restitution.

■ Lanese argues that the district court's refusal to permit cross-examination on Golino's previous arrest deprived Lanese of his sixth amendment right to confront the witnesses against him by denying him the opportunity to cross-examine the key government witness on a matter of bias.

Lanese contends that Golino's past experience with the criminal justice system "showed a specific bias and motive for Golino to testify falsely against Lanese; i.e., that Golino's motive in seeking the assistance of the FBI was not, as he asserted, fear and protection from perceived physical harm from Lanese, but was inspired by a hope to obtain restitution from Lanese...." He further argues that Golino was motivated to "interest" the FBI in the case by "exaggerat[ing] or even mak[ing] up elements of violence and, in the specific case of appellant Lanese, that he saw a gun."

We do not agree. It is highly improbable that Golino believed that, by going to the FBI, he could obtain restitution as Kicska did in 1982. The circumstances of the Kicska incident, although far from clear, did not involve illegal gambling debts, and apparently arose from a dispute among relatives or acquaintances. In contrast, Golino's debts to Lanese and Romano were based on illegal gambling, and were for a much higher amount than Kicska's. Furthermore, the tapes and underlying circumstances in this case provide significant evidence of threats of violence against Golino.

■ Romano argues that the district court's refusal to permit cross-examination of Golino's previous arrest denied Romano a fair trial because it did not allow the jury "sufficient information by which to assess the credibility of the witness." We disagree. The jury learned, through Golino's testimony, that he was enrolled in the federal witness protection program, and, in exchange for his testimony, received money from the federal government and immunity from the state and federal governments for any gambling prosecutions. Golino admitted that he was a compulsive gambler and owed money to the IRS and to various creditors. Furthermore, in addition to the testimony, the jury had the benefit of observing Golino's demeanor. Thus, on the question of the credibility of Golino, there was enough evidence from which the jury could have passed upon his credibility.

■ Both Lanese and Romano object to various evidentiary rulings of the district court. Specifically, Lanese points to the district court's failure to grant his motion for a severance, the admission into evidence of "serious, uncharged criminal conduct by ... Iannucci," and the district court's failure "to instruct the jury with respect to multiple conspiracies."

Before trial, Lanese moved for a severance, pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Lanese did not renew the motion at any point during the trial. In some circuits, failure to renew a Rule 14 motion after the close of all the evidence would result in a failure to preserve the issue for appeal. *See, e.g., United States v. Swift,* 809 F.2d 320, 323 (6th Cir.1987); *United States v. Loya,* 807 F.2d 1483, 1494 (9th Cir.1987); *United States v. Mansaw,* 714 F.2d 785, 790 (8th Cir.), *cert. denied,* 464 U.S. 964, 104 S.Ct. 403, 78 L.Ed.2d 343 (1983). In this circuit, "failure to pursue vigorously the severance issue below increases our reluctance to second-guess the trial court's decision." *United States v. Lyles,* 593 F.2d 182, 192 (2d Cir.),

*cert. denied,* 440 U.S. 972, 975, 99 S.Ct. 1537, 1545, 59 L.Ed.2d 789, 794 (1979).

On appeal, a trial court's denial of a Rule 14 motion to sever is "virtually unreviewable." *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir.1988) (quoting *United States v. Stirling,* 571 F.2d 708, 733 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978)), *cert. denied,* —— U.S. ——, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). To prevail, "the defendant must show that he or she suffered prejudice so substantial as to amount to a miscarriage of justice." *Id.* (citing *United States v. Bari,* 750 F.2d 1169, 1177 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985)).

Lanese has failed to show that his joint trial with Romano and Iannucci was "a miscarriage of justice." The tapes introduced at trial, together with Golino's testimony, provide sufficient evidence to support a jury finding that Lanese, Romano, and Iannucci were involved in a common scheme to extort money from Golino.

■ As for the district court's failure to instruct the jury on the law of multiple conspiracies, Lanese's failure to request a jury charge on multiple conspiracies, and his failure to object when the court instructed the jury, results in a failure to preserve the issue for appeal. Rule 30 of the Federal Rules of Criminal Procedure provides that "[n]o party may assign as error any portion of the [jury] charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Fed.R.Crim.P. 30. Furthermore, we note that the district court carefully instructed the jury that:

> [i]f you are satisfied that the conspiracy charged in the indictment existed, you must next ask yourselves who the members of the conspiracy were. In deciding whether the defendant whom you are considering was, in fact, a member of the conspiracy, you should consider whether, based upon all of the evidence, it appears

that the defendant knowingly and willfully joined the conspiracy.

. . . . .

> It is important for you to note that the defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators and the reasonable inferences which may be drawn from them.

The court also carefully instructed the jury on the elements of the crimes charged, and the need to analyze the evidence against each defendant separately.

■ Romano contends that the district court erred in not admitting into evidence an investigative report of the Stratford, Connecticut Police Department, dated April 21, 1988, on the alleged arson of Romano's car. The report noted that Romano "stated that he had a possible suspect Gary Tangway (sic)." Gary Tanguay was identified at trial as an associate of Lanese. Romano contends that the police report is evidence of Romano's claim that he "was equally as vulnerable to Lanese's threats as was Golino, and that such threats were actually carried out through Lanese's agent, Gary Tanguay."

Romano cites Rule 803(8)(C) of the Federal Rules of Evidence in support of his contention that the police report should have been admitted. Rule 803(8)(C) admits into evidence "against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). We find that the court had sufficient grounds to refuse admission of the report, since "the source of information or other circumstances indicate lack of trustworthiness."

The report, and the underlying incident, occurred after all the events alleged in the indictment, and six weeks after a police search of Romano's house. In addition, the contents of Romano's full statement to the officers suggested that he was biased against Tanguay. Romano accused Tanguay of "possibly dealing heroin." He also

told the officers "that he would go more into detail[,] as to why he suspected Tangway (sic)[,] with detectives." Furthermore, the record does not reveal that Romano was unable to produce the testimony of the investigating officers or of police detectives. In short, since "the source of information or other circumstances indicate lack of trustworthiness," the district court had sufficient reason to refuse to admit Romano's statement.

■ The record reveals ample evidence to justify the jury's findings of guilty on the offenses charged. Since the allegations of error pertain to areas in which the district court had discretion, and no abuse of that discretion has been established, none of the errors attributed to the court warrants reversal. Accordingly, the convictions are affirmed.

## SENTENCING

■ Lanese argues generally that "the district court misconceived its sentencing responsibility under the sentencing guidelines by relegating itself to the mere approval or disapproval of the recommendations of the probation officer who prepared [Lanese's] presentence report...." We disagree. The transcript of the sentencing of Lanese indicates that the court adequately considered the facts and circumstances surrounding Lanese's conviction, including the contents of his handwritten letter to the court, submitted prior to sentencing. The court did not "merely approve or disapprove" the recommendations in the presentence report.

Both Lanese and Romano present more specific objections to their sentences. Lanese contends that the district court erred in its computation of Lanese's "offense level," within the meaning of the Sentencing Guidelines. Lanese argues that the court should have granted him "a downward adjustment ... because of his acceptance of responsibility." Both Lanese and Romano contend that the court incorrectly increased their offense levels because Lanese possessed a gun during the commission of the crime, and because they acted in a manage-

rial or supervisory capacity in a criminal activity involving five or more participants.

Lanese and Romano were sentenced pursuant to the Sentencing Guidelines established by the United States Sentencing Commission. *See* 28 U.S.C. § 994(a) (Supp. 1987); *see generally,* 28 U.S.C. § 991 et seq. (Supp.1987). Section 3553(b) of title 18 of the United States Code provides that the district court "shall impose a sentence of the kind, and within the range, referred to in [the Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. 3553(b) (1988). A defendant may appeal from a sentence "imposed as a result of an incorrect application of the sentencing guidelines...." 18 U.S.C. § 3742(a)(2) (1988).

■ On review of sentences imposed under the Sentencing Guidelines, "[t]he court of appeals ... shall accept the findings of fact of the district court unless they are clearly erroneous...." 18 U.S.C. § 3742(e) (1988). The determination of the application of a Sentencing Guideline is a question of fact, entitled to the "clearly erroneous" standard of review. *See United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989) (district court determination that defendant was "an organizer" within section 3B1.1(c) is "a fact question," and is entitled to the "clearly erroneous" standard of review); *United States v. Ortiz,* 878 F.2d 125, 126–27 (3rd Cir.1989) (district court determination that defendant was "an organizer or leader" within section 3B1.1(b) is "essentially factual," and is entitled to the "clearly erroneous" standard of review); *United States v. Wright,* 873 F.2d 437, 443–44 (1st Cir.1989) (district court determination that defendant was not a "minimal" or "minor" participant within section 3B1.2 is "essentially factual," and is entitled to the "clearly erroneous" standard of review); *United States v. Mejia–Orosco,* 867 F.2d 216, 220–21 (5th Cir.) (district court determination that defendant was "an organizer, leader,

manager, or supervisor" within section 3B1.1(c) is "a factual finding," and is entitled to the "clearly erroneous" standard of review), *cert. denied,* — U.S. —, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989).

■ The Sentencing Guidelines direct the district court to determine the "offense level" of a convicted defendant. *See* United States Sentencing Commission, *Federal Sentencing Guidelines Manual* § 1B1.1(b) (1988). A defendant's offense level is determined by finding the "base offense level" established for the particular crime and adding any adjustments to the offense level, according to the circumstances of the crime, the number of counts of the conviction, "the defendant's acceptance of responsibility," and the defendant's criminal history. *See* § 1B1.1; *see also* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 Hofstra L.Rev. 1, 6–7 (1988).

■ Pursuant to section 2E2.1(a), both Lanese and Romano were given base offense levels of twenty for their convictions. The offense levels were increased to twenty-three, pursuant to section 2E2.-1(b)(1)(C), because "a firearm ... was possessed" during the crime, specifically, during the December 18, 1987 meeting with Golino. Lanese argues that, since he was licensed to carry a handgun and he did not use or display the handgun during the meeting, the court incorrectly increased his offense level. Romano contends that his offense level should not be increased by Lanese's possession of a gun, and cites tapes of one of his conversations with Golino, introduced at the trial by the government, in which he denies knowing in advance that Lanese would be carrying a weapon at the December 18 meeting.

We disagree with the contentions of both Lanese and Romano. Section 2E2.1(b)(1)(C) specifically states that "if a firearm or other dangerous weapon was brandished, displayed or possessed, increase by 3 levels." In plain language, the section applies to both Lanese and Romano. It is satisfied by mere possession of the firearm during the crime, and does not require the particular defendant to have been in possession.

Furthermore, the applicable definition of "firearm" does not exclude licensed handguns. See § 1B1.1, application note (1)(e) (" 'Firearm' means any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive.").

■ Lanese argues that the court should have reduced his offense level by two, pursuant to section 3E1.1(a), because he "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." In support of his contention, Lanese refers to a handwritten letter to the court prior to his sentencing, in which he acknowledged being involved in illegal gambling. Lanese notes that "even at the trial, when the issue was fraught with more significance and without any separate incentive, appellant Lanese acknowledged that the Golino indebtedness arose from gambling losses."

A complete reading of section 3E1.1, however, reveals that Lanese has not "accepted responsibility" within the meaning of that section. The Sentencing Commission suggests that, in determining whether a defendant has "accepted responsibility," the court should consider, among other factors, whether the defendant has made a "voluntary and truthful admission to authorities of involvement in the offense and related conduct...." § 3E1.1, application note (1)(c). Additionally, "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless it is without foundation." § 3E1.1, application note (5).

The sole factor that arguably may support Lanese's claim that he "accepted responsibility" is that he admitted "involvement in the offense and related conduct." However, Lanese's only admissions, in the letter and at trial, were to illegal gambling. He never "accepted responsibility" for the offenses charged, namely using and conspiring to use extortionate means to collect illegal gambling debts. Clearly, Lanese was not entitled to a downward adjustment

of his offense level, as permitted by section 3E1.1.

■ Romano contends that he was not "a manager or supervisor," within the meaning of section 3B1.1(b), and, thus, "the adjustment found by the Court was erroneous ... as to the role played by the defendant...." In contrast, the government asserts that "Romano apparently supervised ... the two bookies who took bets from Golino in the fall of 1987." In support of its assertion, the government referred to several statements made by Romano to Golino, contained in the tapes introduced at trial.

In response to Golino's protestations that he could not pay his debt, Romano responded "you know how many times I hear this." At another point, Romano is heard separating papers and money and telling Golino "[t]his is yours." Then, after a pause, Romano states "[t]he other guys...." The government asserted that these comments "suggest that Mr. Romano was involved in the collection of monies owed by any number of people for this enterprise; that he was not simply a runner in connection with this debt owed by Mr. Golino." The government also refers to comments made by Romano, and contained in the tapes introduced at trial, that he "received orders" from "Danbury" or "New York."

In addition, the evidence showed that Romano visited a federal prison in Danbury to meet with Vincent Esposito. According to the testimony of an FBI agent, Esposito previously "ran the sports bookmaking business for ... the Greater Bridgeport area." There was also evidence that, in the fall of 1987, Romano referred Golino to a bookmaker.

The evidence supports a finding that Romano was part of a criminal organization, and that he was engaged in a practice of using extortionate means to collect illegal gambling debts. It does not, however, support a finding that Romano was "a manager or supervisor" of the organization. There is no evidence, in the record before this court, to support the government's assertion that Romano "managed" or "supervised" the bookmakers, or that he had au-

thority over anyone else involved in the conspiracy. Hence, the district court's finding that Romano was "a manager or supervisor," within section 3B1.1(b), was "clearly erroneous." Accordingly, Romano's sentence is reversed and the case is remanded, as to Romano, for resentencing.

■ Lanese contends that the court incorrectly increased his offense level by three, pursuant to section 3B1.1(b), because he was "a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive...." It is not disputed that Lanese acted as "a manager or supervisor." Lanese, however, asserts that the criminal activity did not "involve[ ] five or more participants."

In support of his contention, Lanese stresses that the indictment lists only four conspirators, Lanese, Romano, Iannucci, and Plotkin, and thus section 3B1.1(b) does not apply. The district court, which determined that "the criminal activity involved five or more participants," did not list or identify the participants. For purposes of section 3B1.1(b), a " 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." § 3B1.1, application note (1).

As the government correctly notes in its brief, the testimony established that at least three bookmakers received bets for Lanese and Iannucci, over the telephone. Hence, the evidence clearly shows that at least five persons were involved in the illegal gambling operations. The government presented no evidence, however, showing that the bookmakers participated in, or had knowledge of, the use of extortionate means to collect illegal gambling debts, the crime charged.

The government also notes that "at the meetings attended by Lanese, Gary Tanguay and another unidentified man appeared to be serving as guards or backup for Lanese." The government's assertion, that the "five or more participants" included Tanguay and another unidentified man, appears to be speculation. The only evidence which supports the government's as-

sertion is the testimony of FBI agents, who observed the two men during surveillance of Lanese.

Finally, the government contends that the "testimony at trial ... suggested that Vincent Esposito, an inmate at the Federal Correctional Institution at Danbury, played a role in the collection of Golino's debt." The only evidence tying Esposito to the crime was that Romano, and one of the bookmakers, visited Esposito in prison, and that Romano apparently referred to Esposito when he told Golino, on tapes introduced at trial, of receiving orders from "Danbury."

At trial, the government presented tapes of the conversations between Esposito and Romano. The tapes consisted mainly of discussions about Esposito's family. Romano's statements to Golino, concerning orders from "Danbury," do not plainly refer to Esposito. Even in the context of Romano's visits to Esposito in Danbury, Romano's statements are insufficient to show that Esposito was a "participant" in the crime charged.

Since, on the record before this court, it is unclear whether there is sufficient evidence to support the district court's determination as to the number of "participants," for purposes of section 3B1.1(b), we remand to the district court for a specific finding as to the identities of the "participants."

We recognize that requiring a district judge to make specific factual findings in determining the applicable sentencing guidelines may "interfere with the smooth operation of the sentencing hearing." *Mejia–Orosco*, 867 F.2d at 221. It cannot be disputed, however, that "[s]pecific findings will both guide reviewing courts to the evidentiary basis for sentencing judgments, and also help the trial judge to identify matters relevant to application of the guidelines." *Id.* at 221–22; *see also Herrera*, 878 F.2d at 1002.

■■■ The government, alternatively, argues that "the evidence would support a finding that the criminal activity was 'otherwise extensive'" within the meaning of section 3B1.1(b). The government contends that "the evidence showed a widespread bookmaking operation that routinely resorted to extortion to collect debts." Specifically, from the tapes introduced at trial, the government refers to several comments of Romano, in which he hinted that he collected illegal gambling debts from persons other than Golino. The government also refers to betting slips found on Iannucci, apparently referring to bets other than those of Golino.

We do not doubt that Lanese and Iannucci's bookmakers may have accepted bets from persons other than Golino. The district court, however, based its section 3B1.1(b) upward adjustment of the offense level on a determination that there were five or more participants in the crime. Accordingly, we cannot determine whether the activity was "otherwise extensive." On remand, the district court may make the appropriate finding.

## CONCLUSION

Since the record reveals sufficient evidence to justify the jury's findings of guilty on the offenses charged, and none of the errors alleged by Lanese and Romano warrant reversal, the judgments of conviction are affirmed.

Since the district court did not make a specific finding as to the identities of the "five or more participants" involved in the criminal activity, or that the criminal activity was "otherwise extensive," this court cannot determine whether Lanese's offense level was correctly increased by three points pursuant to section 3B1.1(b). Accordingly, as to Lanese, the case is remanded for specific findings required by section 3B1.1(b).

Since Romano was not "a manager or supervisor," his offense level was incorrectly increased by three points pursuant to section 3B1.1(b). Hence, as to Romano, his sentence is reversed, and the case is remanded for resentencing.