UNITED STATES of America, Appellee,

v.

Ramon RODRIGUEZ–GONZALEZ and
Reuben Vargas–Santanas,
Defendants–Appellants.

Nos. 714, 861, Dockets 89–1346, 89–1348.

United States Court of Appeals,
Second Circuit.

Argued Feb. 21, 1990.

Decided March 27, 1990.

David A. Lewis, New York City, The
Legal Aid Soc., Federal Defender Services
Unit, for defendant-appellant Rodriguez–
Gonzalez.

Donald Du Boulay, New York City, for defendant-appellant Vargas–Santanas.

David B. Fein, New York City, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty., S.D.N.Y., David E. Brodsky, Asst. U.S. Atty., of counsel), for appellee.

Before FEINBERG, CARDAMONE and MINER, Circuit Judges.

FEINBERG, Circuit Judge:

Defendants Ramon Rodriguez–Gonzalez and Reuben Vargas–Santanas appeal from sentences imposed in the United States District Court for the Southern District of New York, after a jury trial before Judge Pierre N. Leval. Appellants were both convicted of various narcotics offenses, specifically violations of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), 841(b)(1)(C) and 846. In addition, Rodriguez–Gonzalez was acquitted of using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). The district court sentenced Rodriguez–Gonzalez to concurrent terms of 110 months on all counts and supervised release for four years thereafter on the substantive counts, and Vargas–Santanas to concurrent terms of 115 months and supervised release for five years on all counts.

Because appellants' underlying acts occurred after November 1, 1987, the Federal Sentencing Guidelines apply. Appellants raise a number of issues in their appeals, the most significant concerning whether the Double Jeopardy and Due Process Clauses of the Fifth Amendment prohibited the enhancement of Rodriguez–Gonzalez' sentence on the basis of conduct for which he had been acquitted.

For reasons given below, we affirm the judgments of the district court.

## I. Background

The government introduced evidence at trial from which a jury could find that appellants operated a narcotics business out of Vargas–Santanas' apartment on the Upper West Side of Manhattan, and that they sold cocaine to, among others, Jim Joy, a confidential informant working for the Drug Enforcement Administration (DEA). The evidence principally concerned two drug transactions. The first occurred on November 1, 1988, when Jim Joy arranged, through a person named "Papo," to meet individuals from whom he could purchase a kilogram of cocaine. That day, Papo brought Joy to the apartment of Vargas–Santanas, for whom Papo worked as a runner, bringing cocaine customers in exchange for cocaine or money. During this transaction, Vargas–Santanas told Joy that in addition to the cocaine that he would sell to him that day, he could sell Joy a kilogram of cocaine at a later time. Vargas–Santanas sold Joy 101 grams of cocaine, less than an eighth of a kilogram, but he showed Joy what Vargas–Santanas said was a kilogram, which he could not break apart because he had "somebody coming over for it." Vargas–Santanas and Joy negotiated over the price for the 101 grams, and throughout the negotiations and sale, Rodriguez–Gonzalez stood by. Joy told Vargas–Santanas that he would be in touch with him again through Papo, and as Papo and Joy left the apartment, Vargas–Santanas gave Papo a $50 bill and a small packet of cocaine. Later that night, Papo returned to the apartment on several occasions with other cocaine customers for Vargas–Santanas and Rodriguez–Gonzalez.

On the next day, Joy arranged through Papo to buy a kilogram of cocaine from Vargas–Santanas. Joy and Papo were let into the apartment by Rodriguez–Gonzalez, who was alone and told them that Vargas–Santanas would return soon. After a few minutes, Rodriguez–Gonzalez placed a telephone call and told Joy and Papo that Vargas–Santanas was on his way. While they waited, three or four people came in and out of the apartment, and Rodriguez–Gonzalez made at least two cocaine sales. When Vargas–Santanas arrived at the apartment, he placed a telephone call and told Joy to come back to the apartment in about 40 minutes for the kilogram. When Joy returned to the apartment, he was once again let in by Rodriguez–Gonzalez, and while Joy waited, Rodriguez–Gonzalez made two telephone calls and then said that Vargas–Santanas would be there shortly.

When Vargas–Santanas returned with the kilogram, Joy sent Papo out to get the money, and Vargas–Santanas stated that he would return with the cocaine when Rodriguez–Gonzalez informed him that the money had arrived. Vargas–Santanas then left the apartment again.

Shortly thereafter, DEA Special Agents, responding to a signal from Joy, knocked on the door and identified themselves as police officers. Rodriguez–Gonzalez, who heard the knock and announcement, ran back to the kitchen and threw a bag containing cocaine and a triple-beam scale out the window. The agents, after receiving no response, forcibly entered the apartment and apprehended Rodriguez–Gonzalez as he was running from the kitchen toward the living room. In performing a security sweep of the apartment, DEA Agents found in the living room a loaded .357 magnum revolver on top of stereo equipment. Agents also found narcotics paraphernalia and drug records in the living room, and, in the interior courtyard of the building, below the kitchen window, the bag which contained the scale and almost 500 grams of cocaine. Vargas–Santanas was arrested several days later.

At trial, Rodriguez–Gonzalez and Vargas–Santanas called no witnesses and did not testify.

At his sentencing proceeding in June 1989, Rodriguez–Gonzalez objected to the computation of his total offense level under the Guidelines, contained in the presentence investigation report prepared by the Probation Department. His base offense level came to 26, based on a total of 1580.6 grams of cocaine. United States Sentencing Commission, Guidelines Manual, § 2D1.1(c) (Nov. 1989) (hereinafter U.S.S.G.). The Probation Department added two levels to the base offense level for the specific offense characteristic that a firearm "was possessed during commission of the offense," U.S.S.G. § 2D1.1(b)(1), and added two more levels for Rodriguez–Gonzalez' attempt to destroy or conceal material evidence, U.S.S.G. § 3C1.1. Accordingly, the total offense level was 30, which resulted in a Guidelines range of 97–121

months. After hearing argument, the district court determined that the Probation Department correctly calculated Rodriguez–Gonzalez' Guidelines range and imposed concurrent terms of 110 months on each count, to be followed by four years of supervised release.

Vargas–Santanas was sentenced a week later. Vargas–Santanas' base offense level was also calculated at 26, based on a total of 1580.6 grams of cocaine. U.S.S.G. § 2D1.1(c). Two levels were added to his base offense level, as with Rodriguez–Gonzalez, for the possession of a firearm during commission of the offense, § 2D1.1(b)(1), and two more levels for being an organizer, leader, manager or supervisor in the criminal activity, U.S.S.G. § 3B1.1(c). Accordingly, the total offense level was 30, which produced a Guidelines range of 97–121 months. After hearing argument, the district court accepted the calculations of the Probation Department and imposed concurrent terms of 115 months on each count, to be followed by five years of supervised release.

## II. Discussion

### A. *Rodriguez–Gonzalez*

1. *Double Jeopardy*—Rodriguez–Gonzalez asserts that the district court improperly enhanced his Guidelines sentence on the basis of alleged conduct for which he was acquitted, i.e., using a firearm in connection with a drug offense in violation of 18 U.S.C. § 924(c), and that this enhancement violated the Double Jeopardy and Due Process Clauses of the Fifth Amendment. As a threshold matter, we must address the government's contention that Rodriguez–Gonzalez failed to raise his constitutional claims in the district court, and therefore waived his right to appellate review on these issues. The government maintains that Rodriguez–Gonzalez' only objection below was to the "appropriateness" of the two-point enhancement and not to its constitutionality, and that both the government's response to Rodriguez–Gonzalez' objection and the district court's resolution of the issue also dealt only with appropriateness and not constitutionality.

We disagree. An objection is adequate which fairly alerts the court and opposing counsel to the nature of the claim. See *United States v. Check*, 582 F.2d 668, 676 & n. 22 (2d Cir.1978); cf. *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir.1982) (in banc). At the sentencing proceeding, appellant stated that "when the jury acquits a defendant on circumstances that are practically the same as the basis for the increase in the guideline range included in the guideline statement," it was not appropriate for a court "after the jury has acquitted him on that count, to add two points to the basis of his sentence." Although appellant failed to couch his objection in the specific terms "double jeopardy," the nature of his argument fairly alerted both the court and the prosecutor to his constitutional claim, since one of the distinct abuses that the guarantee against double jeopardy protects against is a second prosecution for the same offense after acquittal. *United States v. Halper*, —— U.S. ——, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989). Moreover, in pointing to the acquittal, Rodriguez–Gonzalez did not say that he was relying on collateral estoppel. Finally, the responses of the court and the government indicate that they were cognizant of the nature of appellant's claim. One of the arguments advanced by the prosecutor and accepted by the court—that the count under 18 U.S.C. § 924(c) charged different conduct than Guideline § 2D1.1(b)(1)—spoke to the requirement of the Double Jeopardy Clause that the second proceeding involve the "same offense."

Turning to the merits, we note that the question whether conduct that is the subject of a prior acquittal can nevertheless be used to justify an enhancement of sentence under the Guidelines is an open question in this circuit. See *United States v. Stephenson*, 895 F.2d 867, 877 n. 3 (2d Cir.1990); *United States v. Bedoya*, 878 F.2d 73, 76 (2d Cir.1989) (per curiam). In a pre-Guidelines case, however, we allowed a sentencing judge to consider the facts underlying an acquittal. See *United States v. Sweig*, 454 F.2d 181, 184 (2d Cir.1972). Four circuits have held that prior related acquitted conduct may be considered for purposes of enhancing a sentence under the Guidelines. See *United States v. Mocciola*, 891 F.2d 13, 17 (1st Cir.1989) (rejecting double jeopardy challenge); *United States v. Isom*, 886 F.2d 736, 738 (4th Cir.1989) (rejecting due process challenge); *United States v. Juarez–Ortega*, 866 F.2d 747, 749 (5th Cir. 1989) (per curiam) (rejecting claim that trial judge, in considering acquitted conduct, overrode jury's determination of a fact); and *United States v. Ryan*, 866 F.2d 604, 608–10 (3d Cir.1989) (rejecting claim that upward departure on the basis of acquitted conduct was unreasonable). But cf. *United States v. Perez*, 858 F.2d 1272, 1277–78 (7th Cir.1988) (observing that consideration of a prior acquittal is permissible as long as acquittal is not relied upon to enhance sentence).

Rodriguez–Gonzalez broadly asserts that these cases are not persuasive, since none adequately address the applicable constitutional concerns. He more specifically contends that the Double Jeopardy Clause prohibits the government, following an acquittal, from relitigating the facts of an offense in any further proceeding that would result in criminal punishment, and that his sentencing proceeding relitigated, and imposed punishment on the basis of, the "same offense" for which he had already been acquitted. In support, Rodriguez–Gonzalez argues that § 2D1.1(b)(1) requires proof of the same four elements— i.e., scienter, possession of a gun, possession during a drug offense and connection to the offense—as are required under 18 U.S.C. § 924(c), the count on which he was acquitted. While Rodriguez–Gonzalez acknowledges that § 924(c) and § 2D1.1(b)(1) differ in their scienter requirements, he contends that for purposes of double jeopardy analysis both nevertheless prescribe punishment for the "same offense," since one cannot commit the § 924(c) offense, requiring the higher mental state of knowledge, without also meeting the requirements of § 2D1.1(b)(1).

We believe that this argument "misperceives the distinction between a sentence and a sentence enhancement." *Mocciola*, 891 F.2d at 17. Had Rodriguez–Gonzalez

been convicted of possessing a firearm in relation to drug trafficking under § 924(c), he would have received a separate, mandatory five-year sentence, to run consecutively, rather than 19–24 months added to the sentence on the offenses for which he was found guilty, as a result of application of § 2D1.1(b)(1) of the Guidelines. In considering the acquitted conduct as a basis for enhancing Rodriguez–Gonzalez' sentence, the district court "was not relying on facts disclosed at trial to punish the defendant for the extraneous offense, but to justify the heavier penalties for the offenses for which he was convicted." *Juarez–Ortega,* 866 F.2d at 749. Of course, from the point of view of a defendant receiving added prison time because of the presence of a gun, the distinction may be academic. But the analysis is crucial in considering the double jeopardy argument. Moreover, the district court's application of § 2D1.1(b)(1) did not, and could not, enhance the maximum penalty authorized by Congress for the offenses on which Rodriguez–Gonzalez was convicted, see U.S.S.G. § 5G1.1(a); rather, the district court's consideration of the acquitted conduct merely affected the point within the statutory range at which his sentence was imposed.

We note that the Supreme Court has rejected on similar grounds a due process challenge to a state statute which subjected a defendant convicted of an enumerated felony to a mandatory minimum sentence if the sentencing judge found, by a preponderance of the evidence, that the person visibly possessed a firearm during the commission of the offense. See *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). In upholding the constitutionality of that statute, the Court twice noted that the statute neither altered the maximum sentence for an enumerated felony nor created a separate offense calling for a separate sentence. *Id.* at 83, 87–88, 106 S.Ct. at 2414, 2416–17. Rather, that statute, like the Guidelines provision at issue here, "operate[d] solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding." *Id.* at 88, 106 S.Ct. at 2417.

Moreover, as pointed out above, prior to the promulgation of the Guidelines this Court had held that a sentencing court could take acquitted conduct into account when fashioning a sentence. *Sweig,* 454 F.2d at 184. Although Rodriguez–Gonzalez suggests that *Sweig* addressed only the question of whether a sentencing judge could consider evidence of crimes for which a defendant was acquitted, and not whether the judge could enhance the sentence based on such evidence, our prior decision should not be read so narrowly. Although it is true, as Rodriguez–Gonzalez points out, that the *Sweig* court did not expressly address double jeopardy, the argument was made to it in the brief for appellant in that case. We reaffirm the validity of the *Sweig* decision after considering and rejecting the constitutional claims now before us. We discern no convincing reason why the *Sweig* rule should not continue to apply with equal force to sentences imposed under the Guidelines, thus permitting sentence enhancement on the basis of acquitted conduct.

Rodriguez–Gonzalez suggests, however, that a sentencing proceeding under the Guidelines shares the trial-like characteristics of the sentence proceedings found to trigger the protections of the Double Jeopardy Clause in *Arizona v. Rumsey,* 467 U.S. 203, 211–12, 104 S.Ct. 2305, 2310–11, 81 L.Ed.2d 164 (1984), and *Bullington v. Missouri,* 451 U.S. 430, 446, 101 S.Ct. 1852, 1862, 68 L.Ed.2d 270 (1981). Reliance on *Rumsey* and *Bullington* is inapposite, however, since those cases arose in the unique context of capital sentencing. In both, the Court concluded that the imposition of a penalty of life imprisonment in a first sentencing proceeding constituted an implied acquittal of a defendant's eligibility for the death penalty, and thus barred, on double jeopardy grounds, the imposition of the death penalty upon a subsequent resentencing. The special considerations implicated in those death penalty cases are not applicable here.

2. *Due Process*—Rodriguez–Gonzalez also argues that it is impermissible to enhance a sentence upon the basis of conduct

for which a defendant was acquitted, since due process entitles an acquitted defendant to be treated as innocent. This court has noted to the contrary that "[a]cquittal does not have the effect of conclusively establishing the untruth of all of the evidence introduced against the defendant." *Sweig*, 454 F.2d at 184; see also *Isom*, 886 F.2d at 738 ("A verdict of acquittal demonstrates only a lack of proof beyond a reasonable doubt; it does not necessarily establish the defendant's innocence.").

Traditionally, a sentencing judge exercised broad discretion in considering all relevant information in determining an appropriate sentence, including evidence of uncharged crimes, dropped counts of a criminal indictment and criminal activity resulting in acquittal. Furthermore, consideration of this evidence was not thought to offend due process, provided a defendant was given an opportunity to contest the accuracy of that information. See, e.g., *United States v. Romano*, 825 F.2d 725, 728 (2d Cir.1987). Under the Guidelines

> [i]n resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information ... provided that the information has sufficient indicia of reliability to support its probable accuracy.

U.S.S.G. § 6A1.3(a). Recent decisions of this court indicate that adoption of the Guidelines has not changed the principle that disputed sentencing factors need only be proved by a preponderance of the evidence to satisfy due process. *United States v. Rivalta*, 892 F.2d 223, 230 (2d Cir.1989); *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989). On the record before us, the district court could properly have found by a preponderance of the evidence that Rodriguez–Gonzalez possessed a firearm during the commission of a narcotics offense. For example, Rodriguez–Gonzalez was present in the apartment at the time that the drug deals took place, and he was apprehended going from the kitchen toward the living room, where the loaded gun was found.

## B. *Vargas–Santanas*

■ Vargas–Santanas raises two challenges to his sentence. First, he asserts that the district court improperly enhanced his base offense level by adding two levels for possession of a firearm under § 2D1.1(b)(1), conduct for which he, unlike his co-defendant Rodriguez–Gonzalez, was not indicted. Vargas–Santanas challenges the enhancement on the ground that the district court's finding that he possessed a firearm was clearly erroneous. Although Vargas–Santanas admits that the agents found a loaded gun on top of a stereo, he nevertheless contends that the gun was improperly attributed to him. In support, Vargas–Santanas claims, among other things, that there was no indication that he ever possessed or used the gun or that it was present during the drug transaction.

■ We are not persuaded. "The determination of the application of a Sentencing Guideline is a question of fact, entitled to the 'clearly erroneous' standard of review." *United States v. Lanese*, 890 F.2d 1284, 1291 (2d Cir.1989); see 18 U.S.C. § 3742(e). In order to receive a Guidelines enhancement for possession of a firearm, a defendant need not be in actual possession of the firearm at the time the firearm is seized. *Lanese*, 890 F.2d at 1292. Although, as Vargas–Santanas points out, the district court noted at trial that it was "not an inconceivable possibility that somebody could have gotten the gun out when the commotion started to occur," i.e., after Vargas–Santanas had left the apartment, we cannot say that the district court's subsequent finding that Vargas–Santanas possessed a firearm during the commission of the crime was clearly erroneous.

At Vargas–Santanas' sentencing proceeding, the district court noted that "the gun was in the apartment that he had used on repeated occasions, indeed only minutes beforehand for the commission of the crime in question, and ... he had admitted it was his apartment." The court further emphasized "all that we know about the service of guns to a narcotics offense, and [in] particular guns of this sort." Moreover, the commentary to § 2D1.1 provides that

"[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons," and further, that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." § 2D1.1, comment (n. 3). By way of example, the commentary states that "the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." Id. The facts of this case are not at all analogous to that hypothetical, despite Vargas–Santanas' contention to the contrary. Thus, under these circumstances, we cannot say that enhancement for weapons possession was improper.

■ Second, Vargas–Santanas argues that the district court erred in adding two levels for his role as an organizer, manager and leader of the criminal activity under U.S.S.G. § 3B1.1(c). Vargas–Santanas argues, among other things, that this was only a three-man operation; that he did not exercise control over others or decision-making authority; and that there was no evidence that he, rather than Rodriguez–Gonzalez, was the leader.

The district court's finding of Vargas–Santanas' dominant role in the offense was not clearly erroneous and the resulting sentence enhancement was proper. For example, Vargas–Santanas negotiated with Joy, the government's confidential informant; sold him the initial 101 grams of cocaine and collected the money for this sale; gave Joy's contact Papo $50 and a small quantity of cocaine, presumably for bringing Joy to the apartment; brought the kilo of cocaine to an apartment that Vargas–Santanas admitted was his own on the day following the 101–gram sale; and directed the activity of Rodriguez–Gonzalez, who had entered the country illegally only one week earlier and conducted small drug deals on Vargas–Santanas' behalf.

The sentences imposed by the district court are affirmed.